*United States v. Felder*

# In the
# United States Court of Appeals
## for the Second Circuit

———————

AUGUST TERM 2020

No. 19-897-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

TYRONE FELDER, AKA MAN MAN,
*Defendant-Appellant,*

KAREEM MARTIN, AKA JAMAL WALKER, TAKIEM EWING, AKA MULLA,
TOMMY SMALLS, AKA TOMMY GUNS,
*Defendants.*\*

———————

On Appeal from the United States District Court
for the Southern District of New York

———————

ARGUED: OCTOBER 21, 2020
DECIDED: MARCH 31, 2021

———————

Before: RAGGI, SULLIVAN, and BIANCO, *Circuit Judges*.

————————————

\* The Clerk of Court is respectfully directed to amend the caption as set forth above.

_____

Defendant Tyrone Felder appeals from a judgment of the United States District Court for the Southern District of New York (Briccetti, *J.*), convicting him of two counts of carjacking resulting in death, *see* 18 U.S.C. § 2119(3); multiple counts of substantive and conspiratorial Hobbs Act robbery, *see id.* § 1951; and related firearms offenses, *see id.* § 924(c). Felder argues that the district court erred in (1) instructing the jury as to the elements of carjacking resulting in death, (2) allowing the government to elicit expert opinion testimony that an object in Felder's hand on surveillance video was a firearm, (3) relying on the good-faith exception to the exclusionary rule to admit historical cell-site location information procured by a warrant not supported by probable cause, and (4) admitting unduly prejudicial photographic and testimonial evidence of Felder's relationship with co-conspirators. Felder further maintains (5) that carjacking resulting in death and Hobbs Act robbery do not categorically satisfy the crime-of-violence element of the firearms offenses for which he stands convicted.

AFFIRMED.

_____

CELIA V. COHEN, Assistant United States Attorney (Danielle R. Sassoon, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, New York, *for Appellee.*

2

BENJAMIN A. SILVERMAN (Andrew G. Patel, Esq., New York, New York, *on the brief*), Law Office of Benjamin Silverman, New York, New York, *for Defendant-Appellant*.

REENA RAGGI, *Circuit Judge*:

Within the span of eight days in August 2014, defendant Tyrone Felder killed two livery cab drivers by shooting each in the head while stealing their cabs for use in armed robberies. Based on this conduct, Felder now stands convicted after a jury trial of nine crimes: two counts of carjacking resulting in death, *see* 18 U.S.C. § 2119(3); two counts of substantive and one count of conspiratorial Hobbs Act robbery, *see id.* § 1951; two counts of discharging a firearm in connection with crimes of violence (the fatal carjackings), *see id.* § 924(c)(1)(A)(iii); and two counts of brandishing a firearm in connection with crimes of violence (the substantive Hobbs Act robberies), *see id.* § 924(c)(1)(A)(ii). The judgment of conviction, entered on April 5, 2019, in the United States District Court for the Southern District of New York (Vincent J. Briccetti, *Judge)*, sentenced Felder to a total of life imprisonment plus 34 years for these crimes.

In appealing this conviction, Felder argues that the district court erred in (1) instructing the jury as to the elements of carjacking resulting in death, (2) allowing the government to elicit expert opinion testimony that an object shown in Felder's hand on surveillance video was a firearm, (3) relying on the good-faith exception to the exclusionary rule to admit historical cell-site location information obtained with a warrant not supported by probable cause, and (4) admitting unduly prejudicial photographic and

3

testimonial evidence of Felder's relationship with co-conspirators in the charged crimes. Felder further maintains (5) that carjacking resulting in death and substantive Hobbs Act robbery cannot categorically satisfy the crime-of-violence element of the firearms offenses for which he stands convicted. For the reasons explained in this opinion, we reject these arguments and, accordingly, affirm the judgment of conviction on all counts.

## BACKGROUND

Because Felder "appeals a judgment of conviction following a jury trial, we summarize the evidence adduced in the light most favorable to the prosecution." *United States v. Ng Lap Seng*, 934 F.3d 110, 116 (2d Cir. 2019). That evidence was extensive, including hours of surveillance video from dozens of different private and public surveillance cameras, historical cell-site location records, various forensics reports, and testimony from numerous witnesses. One of these witnesses, Tommy Smalls, participated directly in the charged crimes with Felder, Kareem Martin, and Takiem Ewing. These four conspirators had known each other since childhood, having grown up together in the same Bronx apartment complex.

### I. The August 5, 2014 Crimes

Smalls testified that, in early August 2014, Felder proposed robbing a McDonald's restaurant in the Bronx. On the evening of August 4, the four conspirators met to finalize their plan, agreeing to carry guns and to carjack a vehicle for use in the robbery. A few hours later, in the early morning of August 5, Smalls, Martin, and Ewing met at Ewing's Bronx apartment, where, after changing clothes and donning latex gloves, they hailed a black livery cab operated by

4

Maodo Kane and directed Kane to drive them to Felder's home. After picking up Felder, the men instructed Kane to drive to a deserted, dead-end block on Hunter Avenue in the Eastchester section of the Bronx. There, Felder pointed a gun at Kane and ordered him out of the car. When Kane failed to comply, Smalls pulled the livery driver out of the car, whereupon Felder shot Kane once in the back of the head, killing him.

Leaving Kane's dead body on Hunter Avenue, Felder took the wheel of the livery cab and drove his three confederates to the targeted McDonald's. Upon seeing a nearby police station and passing police car, however, the men abandoned their original plan and, instead, drove to Yonkers. There, as Felder waited in the cab, Smalls, Martin, and Ewing entered a convenience store and, at gunpoint, forced occupants to the floor, emptied the cash register, and stole cash and bottles of bleach. Surveillance video captured the entire robbery, including Felder at one point opening the targeted store's front door and exhorting his confederates to hurry up.

As the conspirators drove away from the first robbery scene, they spotted a Dunkin' Donuts store and decided to rob it too. Again, Felder waited in the cab while Smalls, Martin, and Ewing entered the store armed with guns. Once again, surveillance video captured the crime, showing terrified employees fleeing into a back room while Martin and Ewing emptied the cash register.

Following the second robbery, the conspirators drove to the vicinity of Yankee Stadium, where they abandoned the stolen livery cab after wiping it down with the stolen bleach to eliminate any incriminating evidence. Surveillance video from the surrounding

5

streets shows the men walking several blocks before catching a cab back to Ewing's apartment. There, the conspirators threw the clothes and gloves worn during the night's crimes down a garbage chute and divided the money taken in the two robberies.

## II.    The August 12, 2014 Crimes

Felder and his confederates soon planned another armed robbery, again to be preceded by a carjacking. Surveillance video, recorded on August 12, 2014, shows Felder, Smalls, Martin, and Ewing exiting Ewing's apartment building and entering a livery cab driven by Aboubacar Bah. The conspirators directed Bah to drive to the Hunts Point section of the Bronx. There, on a quiet block, Felder pointed his gun at Bah's head and instructed him to exit the vehicle. Instead, Bah quickly accelerated the cab, whereupon Felder shot him once in the head, killing him. Surveillance video shows the livery cab—with Bah dead behind the wheel and Felder and his co-conspirators in pursuit on foot—rolling down the street and crashing into parked cars before coming to a halt. The video shows Felder and his confederates then pulling Bah's dead body out of the vehicle and leaving it in the street before driving off in the cab.

The men soon grew concerned that police were following them, and so they abandoned their robbery plan and left the carjacked livery cab on a residential street in the Bronx. Surveillance video captures all four men exiting the vehicle and fleeing on foot, Felder with a dark object in his hand. At trial, a police firearms expert identified this object as a gun. Still other surveillance videos show the conspirators throwing their clothes and gloves into a nearby dumpster and then returning to Ewing's apartment building.

6

There, the men decided they needed to return to the abandoned vehicle to ensure that it contained no incriminating evidence. When Felder, Smalls, and Martin did so, they saw police already at the scene. Street surveillance videos show the conspirators retrieving their clothing and gloves from the dumpster where they had earlier placed them. The men failed, however, to retrieve gloves worn by Martin, thereby allowing authorities to recover the gloves and obtain incriminating DNA evidence.

Within days, authorities arrested all four conspirators. Smalls, Ewing, and Martin would eventually plead guilty, with Felder alone opting to stand trial.[1] After the jury found Felder guilty of all nine crimes charged in this case, the district court imposed a total prison sentence of life plus 34 years.[2] This timely appeal followed.

---

[1] For crimes relating to the described events of August 2014, Smalls was sentenced to a total of 180 months' incarceration, to run consecutively to a 60-month sentence imposed by Chief Judge Colleen McMahon in a separate gang case, in which Smalls, Felder, Martin, and numerous others faced charges. Ewing was sentenced to a total of 384 months' incarceration and Martin to a total of 480 months' incarceration, to run consecutively to an 84-month part of a total 180-month sentence imposed by Judge Valerie Caproni in the same gang case.

[2] This sentence reflected concurrent prison terms of life on each of the two counts of carjacking resulting in death and of 20 years on each of the three counts of Hobbs Act robbery, to run consecutively with consecutive prison terms of 10 years each on the two counts of discharging a firearm in relation to a crime of violence, and 7 years each on the two counts of brandishing a firearm in relation to a crime of violence. The district court further ordered that Felder's sentences on the four firearms counts of conviction run consecutively to the total 312-month (26-year) sentence imposed on him by Judge Caproni in the separate gang case.

## DISCUSSION

### I.     Jury Instructions as to Carjacking Resulting in Death

Felder stands convicted on two counts of carjacking resulting in death in violation of 18 U.S.C. § 2119(3).  The statute states, in relevant part, as follows:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall— . . .

> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119.

Felder argues that the jury was erroneously instructed as to the *mens rea* and causation elements of this crime.  Because "[t]he propriety of a jury instruction is a question of law," we review Felder's claim *de novo.  United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) (internal quotation marks omitted).  To secure reversal, Felder must demonstrate that the instruction given was erroneous, *i.e.*, that when viewed as a whole, the instruction misled or inadequately informed the jury "as to the correct legal standard."  *Id.* (internal quotation marks omitted).  Felder must also show that the instruction he requested was correct in all respects, and that he suffered ensuing prejudice. *See United States v. Fazio*, 770 F.3d 160, 166

8

(2d Cir. 2014). Here, Felder cannot demonstrate either error or prejudice.

## A. The *Mens Rea* Instruction

In charging the *mens rea* element of federal carjacking, the district court instructed the jury as follows:

> The third element the Government must prove beyond a reasonable doubt is that the Defendant acted with intent to cause death or serious bodily harm. To establish this element, the Government must prove that at the moment the Defendant, or those he is alleged to have aided and abetted, demanded or took control of the vehicle, the Defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car *or for any other reason.* A Defendant may intend to engage in certain conduct only if a certain event occurs. In this case, the Government contends that the Defendant intended to cause death or serious bodily harm if the victim refused to turn over his car. If you find beyond a reasonable doubt that the Defendant had such an intent, the Government has satisfied this element of the offense.

Trial Tr. at 1322 (emphasis added).

Felder argues that the district court erred in including the italicized language despite his request that it be omitted. He

9

maintains that a defendant can only be guilty of violating § 2119(3) if, at the time of the carjacking, he intended to harm or kill the driver for the purpose of stealing the vehicle. Felder contends that the challenged charge was prejudicial as it allowed the jury to convict him on the § 2119(3) counts even if the charged killings were not committed for the purpose of stealing Kane's and Bah's vehicles.

Felder's arguments fail because he cannot show either error or prejudice. While we would normally address these points in that order, because lack of prejudice is quickly demonstrated, we discuss that first. Felder cannot demonstrate prejudice because the case was, in fact, submitted to the jury on the theory he urged. When the quoted *mens rea* charge is considered as a whole, it is evident that, although the jury was told that the murderous or injurious intent required by § 2119 could be conditional ("if necessary to steal the car") or unconditional ("or for any other reason"), the jury was also instructed that, in Felder's case, the prosecution was proceeding on a theory of conditional intent: "A Defendant may intend to engage in certain conduct only if a certain event occurs. In this case, the Government contends that the Defendant intended to cause death or serious bodily harm *if the victim refused to turn over his car." Id.* (emphasis added). Moreover, in the immediately following sentence, the district court told the jury that the prosecution would satisfy the *mens rea* element if the jury found "beyond a reasonable doubt that the Defendant had *such an intent*," *i.e.*, an intent to kill or seriously injure "if the victim refused to turn over his car." *Id.* (emphasis added). In sum, Felder's case was submitted to the jury on the very conditional intent theory that he urged, and the evidence presented at trial powerfully supports

10

his conviction on that theory.[3]   In these circumstances, Felder can hardly claim that he was prejudiced by the district court's passing reference to a theory of unconditional murderous or injurious intent specifically not pursued in the case.  *See generally United States v. Shamsideen*, 511 F.3d 340, 347–48 (2d Cir. 2008) ("The law recognizes that instructions correctly explaining [a legal standard], particularly when given repeatedly, can render a charge adequate in its entirety, despite the inclusion of some objectionable language."); *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993) (observing that instruction on legal theory not pursued by government is "surplusage and thus does not create the risk of prejudice" (internal quotation marks omitted)); *see also Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 154 (2d Cir. 2014) (declining to "comb[] through a trial court's instructions seeking language that, when isolated from its context, might be or appear to be misleading").

---

[3] Felder argues that Maodo Kane was not killed to achieve the August 5 carjacking because the conspirators had gained control of the vehicle when they dragged Kane out of it and into the street, *i.e.*, before Felder killed him.  But Kane's forcible removal from the vehicle was so closely followed by Felder shooting the livery cab driver dead as to compel a finding that the events were inextricable.

Felder further argues that Aboubacar Bah was not killed to achieve the August 12 carjacking but, rather, because Felder unintentionally discharged his gun when falling as a result of Bah unexpectedly accelerating the cab.  Of course, the jury's guilty verdict signals rejection of any suggestion that Felder accidentally shot Bah.  Moreover, Felder was already holding his gun to Bah's head when Bah accelerated rather than accede to the demand that he surrender his vehicle.  Such conduct is sufficient to support a finding of conditional intent.  *See United States v. Lebron-Cepeda*, 324 F.3d 52, 57 (1st Cir. 2003) (holding evidence that defendant put loaded gun to carjacking victim's head and threatened him sufficed to demonstrate conditional intent to kill or seriously injure).

11

Second, and more to the point of Felder's claim, the district court committed no error when it charged § 2119 *mens rea* as conditional *or* unconditional. That conclusion is supported by the statutory text, which makes it a crime for a person (1) "with the intent to cause death or serious bodily harm" (2) to "take[] a motor vehicle . . . by force and violence or by intimidation," or attempt to do so. 18 U.S.C. § 2119. This statutory structure indicates that the necessary link between the two elements is one of temporal proximity, *i.e.*, a defendant must possess the requisite intent "to cause death or serious bodily harm" at the time he "takes," or attempts forcibly to take, the motor vehicle. *Id.*; *see, e.g.*, *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) (stating that "we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning," which "can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute" (internal quotation marks omitted)); *United States v. Gayle*, 342 F.3d 89, 92–93 (2d Cir. 2003) (stating that "[s]tatutory construction begins with the plain text" and that "[t]he text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute" (internal quotation marks omitted)), *as amended* (Jan. 7, 2004). Nothing in the text establishes the purpose requirement urged by Felder.

This conclusion is, moreover, compelled by the Supreme Court's decision in *Holloway v. United States*, 526 U.S. 1 (1999). At issue in that case was not whether an "unconditional" intent to kill or injure—even if unnecessary to effect the carjacking—could satisfy the

12

*mens rea* element of § 2119. That seems to have been taken as a given.[4] Rather, at issue was whether a "conditional" intent to kill or injure, dependent on an event that the carjacker hoped would *not* occur—specifically, driver resistance—could *also* satisfy that element. The Supreme Court answered that question in the affirmative, explaining that it "constru[ed] the statute to cover both the conditional and the unconditional species of wrongful intent." *Id.* at 9. In so ruling, the Court identified temporality, not purpose, as the critical limiting factor tying the *mens rea* and *actus reus* elements of § 2119. The Court explained that "the factfinder's attention" is properly drawn "to the defendant's state of mind *at the precise moment* he demanded or took control over the car by force and violence or by intimidation." *Id.* at 8 (emphasis added) (internal quotation marks omitted). "If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied." *Id.* In later reiterating this point, the Court employed language that effectively defeats Felder's jury charge challenge here. The Court stated:

---

[4] Indeed, the *Holloway* dissenters maintained that the requisite intent for conviction under § 2119 could only be unconditional, not conditional. *See Holloway v. United States*, 526 U.S. at 12 (Scalia, J., dissenting); *id.* at 22 (Thomas, J., dissenting). Thus, while Felder argues that the jury could not find him guilty if it was "senseless" for him to kill his carjacking victims, *i.e.*, if the killings, though intentional, were unnecessary to, or for the purpose of, stealing the cars, *see supra* at 11 n.3, Justice Scalia suggests that it was precisely such unconditional killings in the course of carjackings that Congress sought to capture in § 2119, *see id.* at 18–19 (noting that § 2119 was enacted in wake of "well publicized instances . . . of carjackings in which the perpetrators senselessly harmed the car owners when that was entirely unnecessary to the crime," and observing that "[i]t is not at all implausible that Congress should direct its attention to this particularly savage sort of carjacking—where killing the driver is part of the intended crime").

> The intent requirement of § 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car *(or, alternatively, if unnecessary to steal the car)*.

*Id.* at 12 (emphasis added). That is effectively what the district court charged here and, thus, we identify no error.

As the First Circuit has observed, the *Holloway* parenthetical "implies that the Court saw a distinction between killing for its own sake and willingness to kill to effect the theft, and that it deemed both circumstances as meeting the intent standard of § 2119." *United States v. Castro-Davis*, 612 F.3d 53, 62 (1st Cir. 2010). We agree with this reading of *Holloway*, as have at least two other courts of appeals. *See United States v. Washington*, 702 F.3d 886, 892 (6th Cir. 2012) (stating that *mens rea* element of carjacking statute is satisfied by "unconditional intent to do harm" as well as "conditional intent" before concluding that trial evidence satisfied even latter standard); *United States v. Perry*, 381 F. App'x 252, 254 (4th Cir. 2010) (citing *Holloway* in concluding that "a defendant who possesses the intent to kill or seriously harm the driver of a vehicle may be convicted of carjacking, even if his intent to harm is unrelated to the carjacking, so

14

long as his intent is formed when he takes control of the vehicle and he satisfies § 2119's other elements").[5]

Further, the cases cited by Felder do not support his argument that only a conditional intent to kill or injure satisfies § 2119. At issue in *United States v. Applewhaite*, 195 F.3d 679, 682–83 (3d Cir. 1999), was the § 2119 conviction of a defendant who, in the course of a domestic dispute between his paramour and her estranged husband, first beat the husband senseless and then used the victim's own vehicle to transport the unconscious man from the scene. Subsequently, when the victim awoke in the vehicle, the two men exchanged physical blows, and the defendant shot the victim, who survived. *See id.* at 683. The Third Circuit described these circumstances as "tragic," but insufficient to support a § 2119 conviction. *Id.* at 682.

The problem, however, was not with the conditionality of the *Applewhaite* defendant's intent but, rather, with the lack of a nexus between the defendant's violence and his taking of the victim's van. As the court observed, the defendant "clearly intended to seriously harm or kill" his victim. *Id.* at 685. But no record evidence existed to show that, at the moment he used force and violence against the victim, the defendant had any intention of taking the victim's car. Instead, the defendant used force and violence "solely for the purpose

---

[5] The authors of the model federal jury instructions most frequently used in this circuit have also so construed *Holloway*. *See* 3 Leonard B. Sand *et al.*, <u>Modern Federal Jury Instructions (Criminal)</u> ¶ 53A.01, Instr. 53A-6 (2018) (stating with respect to *mens rea* element of § 2119 that jury should be charged as follows: "To establish this element, the government must prove that at the moment the defendant demanded or took control of the vehicle, the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car *or for any other reason*." (emphasis added)).

15

of bludgeoning" his victim; he took the vehicle "as an afterthought in an attempt to get [the victim's] limp body away from the crime scene." *Id.* at 685–86. In this factual context, the Third Circuit observed that "under *Holloway*, unless the threatened or actual force is employed in furtherance of the taking of the car, there is no carjacking within the meaning of 18 U.S.C. § 2119." *Id.* at 686. The court nowhere held that when a defendant does take a vehicle by force and violence, his murderous or injurious intent must be necessary to achieve the taking.

Felder's case is distinguishable from *Applewhaite* in that, here, the two stolen cabs were plainly carjacked by means of force and violence or intimidation. Specifically, Felder demanded each cab at the point of his gun. *Holloway* makes plain that, where a vehicle is thus demanded or taken, a defendant is guilty of carjacking under § 2119 if he simultaneously possessed the intent to seriously harm or kill the driver. It matters not whether such killing or injury was "necessary to steal the car" or "unnecessary to steal the car." *Holloway v. United States*, 526 U.S. at 12.

As for *United States v. Harris*, 420 F.3d 467 (5th Cir. 2005), the Fifth Circuit there reversed a § 2119 conviction for insufficient evidence that a defendant intended to kill or seriously injure his victim "at the precise moment" he took control of his car, the temporal nexus identified in *Holloway*. *Id.* at 471–72 (quoting *Holloway v. United States*, 526 U.S. at 8). The *Harris* trial record indicated that the defendant and his victim had ridden together in the victim's car for some time on the night of the crime before the defendant shot the victim dead, with no evidence (apart from the defendant's own

16

exculpatory testimony) of precisely when the defendant demanded or took control of the car relative to when he killed the victim. *See id.* at 469–70. In these factual circumstances, the court ruled that "[t]he jury had no evidence upon which to determine whether Harris possessed intent to kill or harm at the moment of the taking." *Id.* at 474. Nowhere, however, did the court rule that the evidence had to prove that the defendant's intent to kill was not only contemporaneous with the taking of the car but also conditional on that action being necessary to, or for the purpose of, the taking.

Felder does not—and cannot—argue that the jury here was not properly charged on the need for the government to prove that he possessed the requisite murderous or injurious intent "at the moment" he and his confederates demanded the carjacked vehicles. Trial Tr. at 1322. Nor can he argue that the evidence was insufficient to demonstrate such contemporaneous intent as he held a gun to the head of each livery driver when he and his confederates demanded their cabs. Like the First and Sixth Circuits, we recognize such conduct supports an inference of contemporaneous intent to kill or at least seriously injure the victim. *See United States v. Lebron-Cepeda*, 324 F.3d 52, 57 (1st Cir. 2003) (holding "evidence that [defendant] placed a loaded and cocked revolver against [victim's] head at the inception of the carjacking and verbally threatened him" sufficient to establish requisite intent); *United States v. Adams*, 265 F.3d 420, 424–25 (6th Cir. 2001) (stating "that physically touching a victim with a weapon, standing alone, . . . indicates an intent on the part of the defendant to act violently"). Indeed, the fact that Felder unhesitatingly shot and killed Maodo Kane in the first carjacking only

17

strengthened the inference that he intended to kill or seriously injure Aboubacar Bah in the second carjacking one week later.

In sum, the district court correctly instructed the jury that to prove the *mens rea* element of carjacking in violation of § 2119, the government was obliged to prove that "at the moment" the vehicles in question were demanded or taken by force and violence or intimidation, Felder "possessed the intent to seriously harm or kill the driver if necessary to steal the car or for any other reason."  Trial Tr. at 1322.

## B.  The "Death Results" Instruction

Section 2119 prescribes enhanced penalties for federal carjacking of up to life imprisonment or death, "if death results."  18 U.S.C. § 2119(3).  On this point, the district court charged the jury as follows:

> Now, if, and only if, you find the Defendant guilty of Counts One or Seven [the carjacking counts] as I just explained to you, then you must make a special finding on each of those Counts, Counts One and Seven, for which you found the Defendant guilty.  Specifically, you must determine whether or not death resulted from the actions of the Defendant, or the actions of people the Defendant is alleged to have aided and abetted.  In order to establish that the conduct of the Defendant, or those he is alleged to have aided and abetted, resulted in the death of the victim, the Government

18

must prove beyond a reasonable doubt that *but for* the actions of the Defendant, or those he is alleged to have aided and abetted, the victim would not have died. The Government is not required to prove that the Defendant, or those he is alleged to have aided and abetted, intended to cause the death of the victim. Your finding that death resulted must be beyond a reasonable doubt. In addition, it must be unanimous, in that all of you must agree that death resulted.

Trial Tr. at 1323–24 (emphasis added).[6]

Felder argues that the district court erred in charging but-for causation without further charging proximate causation, which would have required the jury to find that the carjacking victims' deaths were reasonably foreseeable to Felder. This argument finds some support in basic principles of criminal law, which have "long

---

[6] As with the challenged *mens rea* instruction, this causation charge comports with the model instruction for § 2119(3) found in 3 Leonard B. Sand *et al.*, Modern Federal Jury Instructions (Criminal) ¶ 53A.01, Instr. 53A-8, which states in pertinent part as follows:

> The final element the government must prove beyond a reasonable doubt is that death (or serious bodily injury) resulted from the defendant's actions. In order to establish that the defendant's conduct resulted in the death of (or serious bodily injury to) [the victim], the government must prove beyond a reasonable doubt that but for the defendant's actions, [the victim] would not have died (or suffered that injury). The government is not required to prove that the defendant intended to cause the death of (or injure) [the victim].

19

considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause." *Burrage v. United States*, 571 U.S. 204, 210 (2014). Thus, "[w]hen a crime requires 'not merely conduct but also a specified result of conduct,' a defendant generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result.'" *Id.* (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(a) (2d ed. 2003)).

But *Burrage* offers no further guidance relevant here. In that case—which concerned language in the Controlled Substances Act prescribing an enhanced 20-year mandatory minimum sentence for defendants who unlawfully distributed covered drugs when "death or serious bodily injury results from the use of such substance," 21 U.S.C. § 841(a)(1), (b)(1)(A)–(C)—the Supreme Court addressed only the "actual cause" requirement. With respect to that requirement, the Court ruled that the phrase "results from" had to be construed to require "but-for causation" and not simply contributory causation as urged by the government. *Burrage v. United States*, 571 U.S. at 214 (stating "it is one of the traditional background principles against which Congress legislates that a phrase such as 'results from' imposes a requirement of but-for causation" (internal alterations, citations, and quotation marks omitted)). Reversing on that ground, the Court found it unnecessary to decide whether the phrase "results from" further required a jury to be "separately instruct[ed]" to decide whether the victim's death "was a foreseeable result of the defendant's drug-trafficking offense." *Id.* at 208 (quoting second question on which *certiorari* review was granted).

20

Both before and after *Burrage,* however, every court of appeals to address the question has concluded that § 841(b) does not require proof that the resulting death was reasonably foreseeable. *See United States v. Harden*, 893 F.3d 434, 447–49 (7th Cir. 2018); *United States v. Burkholder*, 816 F.3d 607, 618 (10th Cir. 2016); *United States v. Webb*, 655 F.3d 1238, 1250 (11th Cir. 2011); *United States v. De La Cruz,* 514 F.3d 121, 137 (1st Cir. 2008); *United States v. Houston,* 406 F.3d 1121, 1124–25 (9th Cir. 2005); *United States v. Carbajal*, 290 F.3d 277, 284 (5th Cir. 2002); *United States v. McIntosh*, 236 F.3d 968, 972–73 (8th Cir. 2001), *abrogated on other grounds by Burrage v. United States*, 571 U.S. 204; *United States v. Robinson,* 167 F.3d 824, 830–32 (3d Cir. 1999); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994).

The Tenth Circuit decision in *Burkholder* detailed the reasoning informing these decisions. Starting with the statutory text, *Burkholder* highlighted Congress' use of the phrase "results from" rather than "causes," observing that "resulting in death and causing death are not equivalents." *United States v. Burkholder*, 816 F.3d at 614 (internal alterations and quotation marks omitted). The court explained that "[g]enerally, . . . the ordinary meaning of 'results from' imposes a requirement of actual or but-for causation"—the *Burrage* conclusion—"and not proximate causation." *Id.* (internal alterations and quotation marks omitted). Next, the Tenth Circuit noted Congress' use of the passive voice in the phrase "results from," a choice that generally "evinces a concern with 'whether something happened—not how or why it happened.'" *Id.* (quoting *Dean v.*

*United States,* 556 U.S. 568, 572 (2003)[7]).  The court then cited to Congress' explicit inclusion of proximate-cause language in various other statutory penalty enhancements and concluded therefrom that the omission of such language from § 841(b) (the statute at issue) was intentional.  *See id.* at 615–16.  Finally, the court noted that Congress added the death-results-from provision in § 841(b)(1)(E)(i) after courts of appeals had uniformly held identical language in § 841(b)(1)(C) not to require a finding of foreseeability or proximate cause.  *See id.* at 616 (collecting cases from six other circuits).  Mindful that Congress is presumed to be aware of a statute's interpretation when it amends the statute, the Tenth Circuit concluded in *Burkholder* that Congress' enactment of § 841(b)(1)(E)(i) "without codifying therein a proximate-cause requirement strongly suggests that Congress intentionally eschewed such a requirement."  *Id.* at 617.  This conclusion was reinforced by Congress' subsequent amendments to § 841(b), which left the language of § 841(b)(1)(E) untouched.  *See id.* at 617–18.[8]

To be sure, *Burkholder, Harden*, and the other cases just cited were discussing a death-results-from enhancement in the Controlled Substances Act, not the death-results-from enhancement in the

---

[7] In *Dean*, the Supreme Court construed the statutory phrase "if the firearm is discharged" not to require proof that the discharge be knowing or intentional. *Dean v. United States*, 556 U.S. at 572 (quoting 18 U.S.C. § 924(c)(1)(A)(iii), which prescribes 10-year mandatory minimum if firearm discharged by person who used or carried firearm during or in relation to any crime of violence or drug trafficking).

[8] More recently, the Seventh Circuit cited approvingly to much of *Burkholder*'s reasoning in reaching the same conclusion in *United States v. Harden*, 893 F.3d at 447–49.

federal carjacking statute. But *Burkholder*'s reasoning applies as much in the latter context as in the former and we therefore adopt it as our own in concluding that the district court did not err in charging the jury of the need to find but-for causation as to the carjacking victims' deaths, without further charging that the deaths must have been reasonably foreseeable to the defendant. That conclusion is only reinforced with respect to § 2119(3) by the law's temporality requirement: a defendant can only be guilty of carjacking resulting in death if, at the moment he forcibly takes or attempts forcibly to take a vehicle, he possesses a specific intent "to cause death or serious bodily harm." 18 U.S.C. § 2119. Where a defendant is proved to have acted with such murderous or injurious intent at the moment of the carjacking, requiring a resulting death to be "foreseeable" appears redundant and even confusing.

In urging otherwise, Felder emphasizes that federal carjacking resulting in death exposes a defendant to capital punishment, and the Supreme Court has held that the death penalty cannot be imposed on a defendant for "killings that he did not commit and had no intention of committing or causing." Appellant Br. at 32 (quoting *Enmund v. Florida*, 458 U.S. 782, 801 (1982)). Whatever the merits of this argument, any heightened *mens rea* or causation requirement for the death penalty can be submitted to the jury at the capital sentencing phase. Additionally, no *Enmund* concern arises here because the government did not seek the death penalty against Felder.

Finally, even if a foreseeability instruction had been warranted in Felder's case, he would not be entitled to relief from his § 2119(3) conviction because he cannot show that he was prejudiced by the

23

omission. As just noted, the foreseeability of death was implicit in the district court's instruction to the jury that it could find Felder guilty of the charged carjackings only if he acted "with the intent to cause death or serious bodily harm" at the moment the cars were stolen. Trial Tr. at 1322.[9] In this case, that intent was overwhelmingly proved by evidence that Felder pointed and fired loaded guns at his carjacking victims when they resisted demands to surrender their vehicles. While Felder continues to dispute this evidence, we must assume that the jury credited it in finding the intent element proved. And because Felder thus acted with such injurious intent, he must have reasonably foreseen that deaths would result. Indeed, in explaining its decision not to charge foreseeability, the district court observed that both carjacking victims "were killed with a gunshot wound to the back of the head. That normally results in death. I mean, how could there—how could it not be the natural and foreseeable . . . consequence of the acts committed by the defendant[?]" Trial Tr. at 1192. Just so. On this record, we can thus conclude beyond a reasonable doubt that, had foreseeability been charged, the jury would have found it proved. *See Neder v. United States*, 527 U.S. 1, 15 (1999) (ruling that omission of element is subject to harmless error review).

In sum, Felder's jury-charge challenges, both as to *mens rea* and causation, fail for lack of both merit and prejudice.

---

[9] Section 2119(2) cross references 18 U.S.C. § 1365 for the definition of "serious bodily injury." That statute states: "the term 'serious bodily injury' means bodily injury which involves—(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365(h)(3).

24

## II.    Expert Opinion Testimony

Among the many surveillance videos introduced into evidence by the government at trial was one recorded on August 12, 2014—the date of the second carjacking—which showed Felder and his co-conspirators fleeing down an alley after abandoning Aboubacar Bah's livery cab on a Bronx street.  Felder argues that the district court erred in allowing a prosecution firearms expert, New York City Police Detective Jonathan Fox, to testify that, in his opinion, a dark object visible in Felder's hand on this video was a firearm.

"We review a district court's evidentiary rulings under a deferential abuse of discretion standard," *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (internal quotation marks omitted), "and such rulings will only be overturned if they are 'arbitrary and irrational,'" *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021). Even where we identify evidentiary error, however, we will not reverse a conviction if the error was harmless.  *See United States v. Siddiqui*, 699 F.3d 690, 703 (2d Cir. 2012).  These principles apply equally whether a witness is testifying based on personal knowledge or special expertise. *See, e.g.*, *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (reviewing decision to admit or exclude expert testimony for abuse of discretion).  Before admitting expert opinion testimony, however, the trial judge must determine that the expert possesses "specialized knowledge [that] will assist the trier of fact, *i.e.*, will be not only relevant, but reliable."  *Id.*  Such specialized knowledge can be grounded in scientific or other particularized training, but it can also derive from personal observations or experience, *see id.*, so long as those observations or experience are "outside the ken of the average person," *United States v. Garcia*,

413 F.3d 201, 216 (2d Cir. 2005). Applying these principles here, we identify no error or prejudice in the admission of Fox's opinion testimony regarding Felder's August 12 possession of a firearm. Some background is helpful to explain our conclusion.

The government first attempted—unsuccessfully—to have an FBI agent identify the object shown in Felder's hand in the August 12 surveillance footage as a firearm. That agent had viewed the video numerous times before trial but, apparently, only realized that the object in Felder's hand was a gun during a break in his direct examination. When the district court expressed doubt about such a belated identification being admitted as *expert* opinion, the government maintained that it could be received as *lay* opinion. *Compare* Fed. R. Evid. 701, *with* Fed. R. Evid. 702[10]; *see* Trial Tr. at 270

---

[10] Rule 701, which governs lay opinion testimony, states as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>> (a) rationally based on the witness's perception;
>> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Rule 702, which governs expert opinion testimony, states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;

("Your Honor, the government agrees with your point that it's clearly not expert testimony. Special Agent Kenney will be testifying on the basis of his personal experience, both observing individuals carrying firearms and personally carrying a firearm."). The district court precluded the agent's opinion testimony finding its probative value weak in light of its recent provenance and outweighed by potential prejudice. *See* Fed. R. Evid. 403. The district court, however, did admit into evidence for the jury's review two still images extracted from the August 12 surveillance video—one of which was an enlarged depiction of Felder with the relevant object in his hand.

Subsequently, the government called Fox who, after being recognized by the court—without objection—as a firearms expert, testified to differences between certain firearms and to the types of ammunition used in each. Shown surveillance footage from the August 5 convenience store robbery, Fox testified that, in his opinion, all three robbers captured on the video (*i.e.*, Smalls, Martin, and Ewing) were holding semiautomatic handguns. Explaining his conclusion, Fox pointed out for the jury the firearms' components that he perceived in the video, specifically, slides, sights, and ejection ports.

The government then advised the district court that it wished also to ask Fox about the August 12 alley surveillance video. The

---

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

government reported that Fox first saw this video earlier that morning and identified the dark object in Felder's hand as a firearm. Felder objected, noting, among other things, that he had not received notice of this expert testimony as required by Fed. R. Crim. P. 16(a)(1)(G).[11]  The government maintained that no notice was required because Fox's opinion was lay, "not expert[,] testimony." Trial Tr. at 692.  The district court concluded otherwise, *see id.* at 694 (observing "Detective Fox is certainly an expert"), and adjourned Fox's examination for six days to afford Felder time to prepare for Fox's anticipated testimony.

When Fox's examination resumed, the detective testified without further objection that, in his opinion, one person seen running down an alley on the August 12 video—earlier identified by other witnesses as Felder—was carrying a semiautomatic handgun in his left hand.  The detective indicated that the video (and the still images captured from it) showed that "the front of the firearm," *i.e.,* "the muzzle," was "pointed in a downward direction."  *Id.* at 1076–77.  Fox further identified for the jury a perceived "slide" at the top of the firearm and, in "the middle," what "appear[ed] to be possibly an ejection port."  *Id.* at 1077.  Shown a different angle of these moments in the alley taken by another surveillance camera, Fox again identified

---

[11] That rule states in pertinent part as follows:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rule[] 702 . . . .  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).

the object in Felder's left hand as a firearm, which was "pointing towards the ground" and "mov[ing] up and down" as Felder ran. *Id.* at 1077–78.

On appeal, Felder maintains that Fox should not have been allowed to testify to this opinion because (1) the government failed to provide adequate notice and (2) the testimony was argument, not expert opinion, which (3) usurped the fact finding role of the jury. The government counters that Fox's testimony was properly admitted expert opinion, or alternatively, lay opinion, and that Felder waived any objection to admission.

As an initial matter, we note that the government mistakenly characterizes the testimony it sought to elicit—first, unsuccessfully from an FBI agent, and then, successfully from Fox—as lay opinion evidence. In doing so, it repeats an error previously identified by this court in *United States v. Garcia*, 413 F.3d at 215 (explaining that "lay opinion must be the product of reasoning processes familiar to the average person in everyday life," and that an opinion "rest[ing] in any way upon scientific, technical, or other specialized knowledge" can only be admitted as expert testimony (internal quotation marks omitted)). Fox's opinion that Felder held a gun in his hand was not based on any personal knowledge of the events at issue, *i.e.*, Fox had not been on the scene when Felder ran down the alley on August 12. *See id.* at 212 (observing that lay opinions about events directly experienced can reflect insights that "you had to be there" to appreciate). Nor was his opinion the product of reasoning or experiences familiar to the average person. *See id.* at 215. To the contrary, the government offered the detective's opinion precisely

because he had specialized knowledge of, and long experience with, firearms and their component parts, which went well beyond that of an average person and which afforded him expert insights helpful to a jury in identifying objects in grainy surveillance images. Thus, in considering Felder's evidentiary challenge to Fox's testimony, we examine it as expert, not lay, opinion testimony.

Nevertheless, we conclude that the district court acted well within its discretion in allowing Fox to offer expert testimony about what he saw in Felder's hand on the August 12 surveillance video and related still images. Felder does not dispute Fox's qualification as a firearms expert, nor does he argue that his expertise was insufficient, as a matter of law, to allow the detective to recognize and identify photographic depictions of firearms. Indeed, Felder raised no objection to Fox's expertise or identification of firearms in co-conspirators' hands as captured in the surveillance video of the August 5 convenience store robbery.

Nor can Felder demonstrate that Fox's challenged testimony usurped the role of the jury. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[T]he use of expert testimony is not permitted if it will usurp . . . the role of the jury in applying th[e] law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original) (internal citations and quotation marks omitted)). Fox testified to his opinion about what was shown in Felder's hand on the grainy August 12 video and, in particular, to what he saw in the video that informed that opinion. He did not "tell the jury what result to

reach" with respect to any of the charges at issue in the case. Moreover, the jury remained free to accept or reject Fox's opinion based on its assessment of the sufficiency of the data and experience informing the proffered opinion, Fox's credibility generally, and the jury's own evaluation of the video. *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 114 (2d Cir. 2013) (identifying no error where "jury is free to accept or reject expert testimony, and is free to draw its own conclusion" (internal alterations and quotation marks omitted)). Indeed, the district court specifically instructed the jury of its right to "disregard" expert opinion "entirely or in part." Trial Tr. at 1348.

The government's failure to give Felder timely notice of its intent to elicit expert opinion testimony from Fox with respect to the August 12 video also warrants no relief on appeal because the district court fashioned a satisfactory remedy by granting Felder a six-day continuance. *See United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (recognizing district court's "broad discretion in fashioning a remedy" for Rule 16 failures, "which may include granting a continuance or ordering the exclusion of evidence" (internal quotation marks omitted)). When Fox's testimony resumed, Felder neither renewed his notice objection nor requested a further extension (despite a specific inquiry from the district court). Rather, the defense proceeded to conduct a vigorous cross-examination, highlighting facts suggesting that the detective's opinion about the August 12 firearm possession was not unreserved.

In sum, the challenge to Fox's testimony fails because Felder cannot show that (1) the district court abused its discretion in

31

admitting this expert testimony, (2) the testimony usurped the role of the jury, or (3) he was prejudiced by delayed notice of the testimony.

## III.    Historical Cell-Site Location Information

Among the evidence offered against Felder at trial were records maintained by telecommunication providers showing historical location and usage data for certain cell phones subscribed to by Felder and other conspirators on the dates of the charged carjackings.  The government procured these records pursuant to a court order issued on October 20, 2014, as then authorized by the Stored Communications Act upon a government showing of "reasonable grounds" to believe that the records sought were "relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  Four years later, in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court ruled that such a reasonable-grounds showing was insufficient to satisfy the Fourth Amendment.  The Court explained that the acquisition of historical cell-site location data from wireless carriers constitutes a "search," which under the Fourth Amendment requires "a warrant supported by probable cause."  *Id.* at 2220–21.  Citing *Carpenter*, Felder moved in the district court to suppress historical cell-site location information obtained pursuant to a court order supported by less than probable cause.  He now argues that the district court erred in denying suppression based on the good faith exception to the exclusionary rule.   Reviewing Felder's legal argument *de novo*, we identify no error in the district court's denial of suppression based on good faith, largely for the reasons already stated by this court in *United States v. Zodhiates*, 901 F.3d 137, 143–44 (2d Cir. 2018), and reiterated in subsequent unpublished orders, *see, e.g.*, *United States v. Miller*, 807 F. App'x 90, 96 (2d Cir. 2020); *United*

*States v. Herron*, 762 F. App'x 25, 31 (2d Cir. 2019); *United States v. Chambers*, 751 F. App'x 44, 46–48 (2d Cir. 2018).

The identification of Fourth Amendment error does not automatically entitle a defendant to the suppression of evidence. As the Supreme Court has instructed, the exclusionary rule must be the judiciary's "last resort, not [its] first impulse" when evidence has been procured in violation of the Fourth Amendment. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The exclusionary rule serves "to deter future Fourth Amendment violations," *Davis v. United States*, 564 U.S. 229, 236–37 (2011), and thus, the harsh remedy of suppression is warranted "only where it results in appreciable deterrence," *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal alterations and quotation marks omitted).

That is not the case where, as here, evidence was procured by complying with existing federal law, specifically by obtaining a judicial order according to terms then specified in the Stored Communications Act. Reliance on a federal statute gives rise to a presumption of good faith unless the statute is "clearly unconstitutional." *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987). The Supreme Court has stated that this presumption applies even if "the statute is subsequently declared unconstitutional, [because] excluding evidence obtained pursuant to [the statutory scheme] prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." *Id.* at 350.

When the government obtained the judicial order here at issue, the Stored Communications Act was not "clearly unconstitutional,"

*id.* at 349, and was, in fact, wholly consistent with the third-party doctrine, which deems a person to have "no legitimate expectation of privacy in information he voluntarily turns over to third parties," *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *see United States v. Miller*, 425 U.S. 435, 443 (1976). Prior to *Carpenter*, all five courts of appeals to have considered the question relied on this doctrine in holding that government acquisition of historical cell-site location information from third parties was not subject to the Fourth Amendment's warrant requirement. *See United States v. Thompson*, 866 F.3d 1149, 1156–60 (10th Cir. 2017); *United States v. Graham*, 824 F.3d 421, 424–25 (4th Cir. 2016) (*en banc*); *United States v. Carpenter*, 819 F.3d 880, 887–88 (6th Cir. 2016), *rev'd*, 138 S. Ct. 2206 (2018); *United States v. Davis*, 785 F.3d 498, 511–13 (11th Cir. 2015) (*en banc*); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600, 610–15 (5th Cir. 2013). Deterrence is not served by suppressing evidence obtained "in reasonable reliance on binding precedent." *Davis v. United States*, 564 U.S. at 241.

It was on that very basis that this court, in *United States v. Zodhiates*, 901 F.3d at 144, recognized a good-faith exception to suppression of cell phone records obtained without a warrant pre-*Carpenter* but pursuant to a subpoena then authorized by the Stored Communications Act, *see* 18 U.S.C. § 2703(c)(2). *Zodhiates*' reasoning applies equally here, where records were obtained under the statute's order requirement rather than its lesser subpoena requirement. This court reached that conclusion summarily in *United States v. Miller*, 807 F. App'x at 96, and *United States v. Chambers*, 751 F. App'x at 46–48. We do so again today in this precedential opinion.

In urging otherwise, Felder argues that the government could not, in good faith, have thought it constitutionally permissible to obtain historical cell-site location information without a warrant after *United States v. Jones*, 565 U.S. 400, 404 (2012) (holding warrantless placement of GPS tracker on defendant's vehicle unconstitutional), and *Riley v. California*, 573 U.S. 373, 386 (2014) (holding warrant required to search cellphone seized during lawful arrest). He is wrong. In neither *Jones* nor *Riley* was the challenged evidence procured under the Stored Communications Act or the third-party doctrine. In *Jones*, the Supreme Court explained that warrantless GPS tracking was unconstitutional because the placement of a tracker on a defendant's vehicle constituted a physical trespass. *See* 565 U.S. at 404 (stating that "[g]overnment physically occupied private property for the purpose of obtaining information"). Here, the government did not trespass onto any property, and certainly not onto Felder's property. Nor did it search any property seized from his person as in *Riley*. *See* 573 U.S. at 386–87. Rather, the government obtained the data at issue by obtaining a court order as then authorized by the Stored Communications Act, which it served on the third party in possession of the data. These crucial differences prompt us to conclude that, even after *Jones* and *Riley*, federal officials could have reasonably relied on this statute and the third-party doctrine to conclude that the requested historical cell-site information could be obtained without a warrant supported by probable cause.[12] *See United*

---

[12] This conclusion finds support in Justice Sotomayor's concurring opinion in *Jones*. *See United States v. Jones*, 565 U.S. at 413 (Sotomayor, J., concurring). Though she questioned the continued viability of the third-party doctrine in a digital age,

*States v. Goldstein*, 914 F.3d 200, 205 (3d Cir. 2019) (holding neither *Jones* nor *Riley* precluded good faith reliance on Stored Communications Act).

Indeed, in *Carpenter*, when the Supreme Court identified historical cell-site data as "qualitatively different" from the "telephone numbers and bank records" to which the third-party doctrine had long applied, it acknowledged that historical cell-site location information "does not fit neatly under existing precedents." *Carpenter v. United States*, 138 S. Ct. at 2214–17. This too, then, supports our conclusion that even after *Jones* and *Riley*, but before *Carpenter*, it was objectively reasonable for authorities to think that, if they complied with the requirements of the Stored Communications Act, no warrant based on probable cause was constitutionally required to obtain historical cell-site location information from a third party.

In sum, on the facts of this case, the district court did not err in relying on the good-faith exception to the exclusionary rule in admitting historical cell-site location information obtained through a judicial order issued under the Stored Communications Act rather than a warrant supported by probable cause.

---

Justice Sotomayor conceded that "[r]esolution of these difficult questions in this case is unnecessary" precisely because "the [g]overnment's physical intrusion" onto defendant's vehicle—the majority's trespass theory—"supplies a narrower basis for decision." *Id.* at 417–18. In short, nothing in *Jones* clearly alerted reasonable officers that where, as here, they sought historical cell-site location information from a third party, compliance with the Stored Communications Act's requirements was no longer constitutionally sufficient and that a warrant supported by probable cause was required.

## IV. Testimony and Photographs of Felder's Relationship with Co-Conspirators

Felder argues that the district court abused its discretion in admitting irrelevant and prejudicial character and propensity evidence in violation of Fed. R. Evid. 402, 403, and 404.

Some of the challenged evidence was photographic, depicting Felder and other persons making gestures and wearing baseball caps, hooded sweatshirts, and t-shirts of different colors. Five of these photographs are at issue on appeal: GX 1100-A (page five); GX 1101-A (page one); GX 1101-A (page two); GX 800-A2; and GX 800-A3.[13] At trial, Felder objected only to GX 800-A2.

Some of the challenged evidence was testimonial. Over defense objection, Nenobia Washington, a resident of the Bronx apartment complex where Felder, Smalls, Martin, and Ewing grew up, testified to frequently seeing the four men together at that location and that, it appeared to her, Felder commanded a certain level of respect from his co-conspirators (and others). Also over defense objection, Jorge Figueroa, a security guard at the same apartment complex, testified that, based on his frequent observations of the four conspirators together, Felder appeared to be in charge.

To the extent Felder objected to this photographic and testimonial evidence, we review the district court's "evidentiary rulings under a deferential abuse of discretion standard." *United States v. Litvak*, 889 F.3d at 67 (internal quotation marks omitted). To

---

[13] We do not address other photographs referenced by Felder in his brief, but not offered into evidence at trial.

the extent he failed to object, our review is limited to plain error. *See United States v. Simels*, 654 F.3d 161, 168 (2d Cir. 2011); Fed. R. Crim. P. 52(b). As a practical matter, the higher standard makes no difference here. Felder cannot show any abuse of discretion and, thus, he cannot satisfy the first requirement for plain error. *See United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020) (identifying error as first element of plain error).

Photographs and testimony linking Felder to co-defendants in the charged case were properly admitted as direct evidence of the men's relationship and, therefore, probative of the charged conspiracy. *See United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998) (holding that photographs were properly admitted to establish relationship among conspirators). In urging otherwise, Felder complains that the photographs, by depicting the men in gang colors and making gang signs, invited a prejudicial inference of propensity to engage in criminal conduct. *See* Fed. R. Evid. 404(b)(1). We are not persuaded.

First, the district court was careful to exclude from trial any evidence of Felder's criminal participation with his co-conspirators in the "YGz" street gang. Second, the challenged photographs depict no weapons, narcotics, or other contraband. Third, the photographs do not depict any obvious indications of gang affiliations. The clothing worn shows no consistent color scheme that might suggest gang membership, and the hand gestures—such as Felder using his thumb and forefinger to form an "L"—would not readily be understood as gang signs by the average person. Indeed, the gesture most frequently depicted—and likely to be recognized—is the offensive

38

one of extending a middle finger, employed by many people with no gang affiliation. Finally, assuming any of the challenged photographs qualify as bad acts evidence, such evidence may be admitted under this court's inclusionary approach to explain or demonstrate a criminal relationship and to help the jury understand the basis for conspirators' mutual trust. *See United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996). On this record, we conclude that the district court did not abuse its discretion in admitting the challenged photographs.

As for the testimony from Washington and Figueroa, Felder does not—and cannot—suggest that these witnesses, based on repeated personal observation of all four conspirators, were not competent to offer lay opinions as to the men's relationships with each other. *See United States v. Garcia*, 413 F.3d at 211 (stating that witness may offer lay opinion that "particular participant, 'X,' was the person directing the transaction" based on, among other things, witness's "personal perception of such subjective factors as the respect various participants showed 'X,' [and] their deference to 'X' when he spoke"). Felder argues that this testimony was impermissible evidence of a character trait implying criminal leadership. We conclude, however, that the district court acted well within its discretion in ruling that the witnesses' perception that co-conspirators accorded Felder respect and deference was more probative than prejudicial on the issue of knowledge, *see* Fed. R. Evid. 404(b)(2), rebutting Felder's suggestion that he was merely present during the August 12 carjacking, "and didn't know what the three other people did," Trial Tr. at 254–55. Indeed, this court has upheld the admission of even prior-crime evidence that rendered

more plausible conspirators' intentional participation in the charged crime. *See United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (admitting evidence of defendants' participation in drug trafficking operation "as probative evidence of defendants' knowledge of the charged drug- and murder-related acts, their intent to engage in these acts, and the development of their relationships with each other"). Where, as here, the challenged testimonial evidence established the nature of a relationship among conspirators without even referencing any prior crimes, the district court did not abuse its discretion by allowing the jury to hear it.

## V.    Crimes of Violence

Felder challenges his § 924(c)(1)(A) convictions for brandishing and discharging a firearm in relation to crimes of violence, arguing that neither Hobbs Act robbery nor carjacking resulting in death qualify as crimes of violence under § 924(c)(3)(A).  As Felder himself acknowledges, his argument is foreclosed by precedent.[14]

Felder's Hobbs Act robbery challenge is defeated by *United States v. Hill*, 890 F.3d 51 (2d Cir. 2018), which expressly held "that Hobbs Act robbery is a crime of violence under 18 U.S.C. § 924(c)(3)(A)." *Id.* at 53.   This court recently reiterated that conclusion in *United States v. Walker*, 974 F.3d 193 (2d Cir. 2020), observing that "[b]ecause prior opinions of a panel of this court are binding upon us in the absence of a change in the law by higher authority or our own in banc proceeding (or its equivalent), *Hill*

---

[14] Felder explains that he raises these arguments to preserve them for further review either by this court *en banc* or by the Supreme Court.

40

controls this case." *Id.* at 201 (internal citations and quotation marks omitted). This same conclusion applies here.

As for federal carjacking, we note at the outset that this court identified an earlier version of 18 U.S.C. § 2119 as a § 924(c)(3) crime of violence, albeit without the benefit of subsequent Supreme Court instructions on the categorical approach. *See United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994) (stating that "[i]t is clear that a violation of section 2119, the carjacking statute, is a crime of violence within the meaning of section 924(c)").[15] In now arguing that the current version of § 2119 is not a categorical crime of violence, Felder focuses on the possibility of the crime being committed by "intimidation," 18 U.S.C. § 2119, which, he maintains, means that it lacks "as an element, the actual, attempted, or threatened use of physical force" as required by § 924(c)(3)(A). Appellant Br. at 56. He is wrong.

In *United States v. Hendricks*, 921 F.3d 320 (2d Cir. 2019), this court rejected a similar challenge to federal bank robbery, a crime that, like federal carjacking, proscribes a taking "by force and violence, or by intimidation." 18 U.S.C. § 2113(a). The *Hendricks* defendant argued that the crime was not categorically violent because a defendant might stand convicted for "*negligently* intimidating a

---

[15] When *United States v. Mohammad* was decided, § 2119 made it a crime for a person "possessing a firearm" to "take[] a motor vehicle . . . from the person or presence of another by force and violence or by intimidation, or attempt[] to do so." 27 F.3d at 819 (second alteration in original) (quoting 18 U.S.C. § 2119 (1994)). At issue in the case was whether double jeopardy precluded a defendant convicted under § 2119 from receiving a consecutive sentence under § 924(c) for using or carrying a firearm in relation to a crime of violence. *See id.* at 818–19 (rejecting double jeopardy challenge).

victim." *United States v. Hendricks*, 921 F.3d at 328 (emphasis in original). This court held that, in fact, to commit the crime by "intimidation," a defendant "must at least *know* that his actions would create the impression in an ordinary person that resistance would be met by force." *Id.* (emphasis in original) (internal quotation marks omitted). Thus, we joined "every circuit to have addressed the issue" in holding "that bank robbery 'by intimidation' under § 2113(a) involves the threatened use of physical force and thus constitutes a crime of violence within the meaning of § 924(c)(3)(A)." *Id.* at 328 & n.35 (collecting cases).

*Hendricks*' reasoning is equally applicable to the federal carjacking statute. Even when committed by intimidation, federal carjacking requires a defendant to act in a way that he knows will create the impression in an ordinary person that resistance to defendant's demands will be met by force. Indeed, that conclusion is only reinforced by the fact that, when a defendant commits carjacking by intimidation, he must act not only with the knowledge that his actions will create the impression that resistance will be met by force, but also "with the intent to cause death or serious bodily harm," 18 U.S.C. § 2119, something he can achieve only through the use of physical force, *see United States v. Castleman*, 572 U.S. 157, 169 (2014) (stating that "knowing or intentional causation of bodily injury necessarily involves the use of physical force"); *United States v. Scott*, No. 18-163, 2021 WL 786632, at *11 (2d Cir. Mar. 2, 2021) (*en banc*) (stating that "defendant's 'use' of violent force depends on his knowing or intentional causation of bodily injury"). Thus, we identify federal carjacking as a categorical crime of violence.

Here too, in so ruling, we join every other court of appeals to have considered the matter. *See Estell v. United States*, 924 F.3d 1291, 1293 (8th Cir. 2019) (recognizing federal carjacking as a § 924(c)(3)(A) crime of violence); *United States v. Jackson*, 918 F.3d 467, 485–86 (6th Cir. 2019) (same); *United States v. Cruz-Rivera*, 904 F.3d 63, 66 (1st Cir. 2018) (same); *United States v. Evans*, 848 F.3d 242, 246–48 (4th Cir.) (same), *cert. denied*, 137 S. Ct. 2253 (2017); *United States v. Jones*, 854 F.3d 737, 740–41 (5th Cir.) (same), *cert. denied*, 138 S. Ct. 242 (2017); *In re Smith*, 829 F.3d 1276, 1280–81 (11th Cir. 2016) (same).

In sum, because both Hobbs Act robbery and federal carjacking are categorical crimes of violence, Felder's challenges to his § 924 convictions fail on the merits.

**CONCLUSION**

To summarize,

(1) Defendant's challenges to the district court's instructions on the *mens rea* and causation elements of carjacking resulting in death, *see* 18 U.S.C. § 2119(3), both fail because these claims lack merit and the purported errors were in any event harmless.

(a) As to *mens rea,* the district court correctly charged that, at the moment defendant demanded or took control of the subject vehicles, defendant had to possess "the intent to seriously harm or kill the driver if necessary to steal the car *or for any other reason.*" Trial Tr. at 1322 (emphasis added).

43

(b) As to causation, the district court correctly charged that the government had to prove beyond a reasonable doubt that "but for" defendant's actions, "the victim would not have died." *Id.* at 1323–24.

(c) Even if the district court should have deleted the challenged language from its *mens rea* charge or required the jury to find proximate causation, the record here permits us confidently to conclude that the jury would have made such findings in any event.

(2) Defendant's evidentiary challenges fail because the district court acted within its discretion in making each of the rulings at issue.

(a) In allowing a firearms expert to testify that, in his opinion, a dark object in defendant's hand on a surveillance video was a gun, the district court (1) did not allow the witness to usurp the factfinding role of the jury (2) with improper argument, and (3) satisfactorily afforded defendant relief from late notice by granting a six-day continuance.

(b) In admitting into evidence historical cell-site location information obtained without a warrant supported by probable cause, the district court reasonably relied on the good-faith exception to the exclusionary rule because the procurement

44

pre-dated *Carpenter v. United States*, 138 S. Ct. 2206 (2018), and the government reasonably relied on the Stored Communications Act, *see* 18 U.S.C. § 2703(d), and the third-party doctrine.

(c) In admitting photographic and testimonial evidence of defendant's relationship with his co-conspirators, the district court reasonably concluded that such evidence was more probative than prejudicial. *See* Fed. R. Evid. 402, 403, & 404.

(3) Defendant's challenge to his firearms convictions under 18 U.S.C. § 924(c)(3)(A) fail because the predicate crimes on which these convictions are based, Hobbs Act robbery, *see id.* § 1951, and federal carjacking, *see id.* § 2119(3), are categorical crimes of violence.

Accordingly, the judgment of conviction is **AFFIRMED**.