19-1645-cr
*United States v. Reichberg*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2020

ARGUED: SEPTEMBER 21, 2020
DECIDED: JULY 15, 2021

No. 19-1645-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

JEREMY REICHBERG, also known as Jeremiah Reichberg, also known
as Yermy Reichberg,
*Defendant-Appellant.\**

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, CARNEY, and PARK, *Circuit Judges*.

————

\* The Clerk of Court is respectfully directed to amend the caption as set
forth above.

Defendant-Appellant Jeremy Reichberg ran a business selling favorable outcomes to encounters with the New York Police Department (NYPD), which he secured by bribing NYPD officers. Following a jury trial, Reichberg was convicted on multiple bribery charges and obstruction of justice in the United States District Court for the Southern District of New York (Gregory H. Woods, *J.*). Reichberg now appeals his convictions, challenging the pre-trial denial of his motion to suppress evidence, a number of evidentiary and trial-management rulings, the district court's failure to inquire into one of his attorneys' potential conflict of interest, the jury instructions, and the sufficiency of the evidence in support of his convictions. None of Reichberg's arguments has merit. Accordingly, we **AFFIRM** the judgment of conviction.

————

JESSICA LONERGAN (Martin S. Bell, Kimberly J. Ravener, Thomas McKay, *on the brief*), Assistant United States Attorneys, *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY; *for Appellee United States of America.*

JOHN C. MERINGOLO (Clara Kalhous, Anjelica Cappellino, *on the brief*), Meringolo & Associates, P.C., New York, NY; *for Defendant-Appellant Jeremy Reichberg.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant-Appellant Jeremy Reichberg ran a business selling favorable outcomes to encounters with the New York Police Department (NYPD), which he secured by bribing NYPD officers. Following a jury trial, Reichberg was convicted on multiple bribery charges and obstruction of justice in the United States District Court for the Southern District of New York (Gregory H. Woods, *J.*). Reichberg now appeals his convictions, challenging the pre-trial denial of his motion to suppress evidence, a number of evidentiary and trial-management rulings, the district court's failure to inquire into one of his attorneys' potential conflict of interest, the jury instructions, and the sufficiency of the evidence in support of his convictions. None of Reichberg's arguments has merit. Accordingly, we **AFFIRM** the judgment of conviction.[1]

## BACKGROUND

Jeremy Reichberg was a self-styled Brooklyn "liaison" to the NYPD,[2] in the business of selling preferred outcomes to encounters with law enforcement. Reichberg's business model functioned by providing lavish, in-kind benefits to high-ranking NYPD officers

---

[1] The resolution of this appeal was held pending resolution of the appeals to this court in *United States v. Skelos*, Nos. 18-3421-cr & 18-3442-cr, which in part concerned a related legal issue. *See infra* Part IX. *Skelos* was decided on February 23, 2021. *United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021).

[2] App. at 3004 (Reichberg's co-conspirator testified that Reichberg called himself a "liaison" to the NYPD and used that title in his email signature).

who, in turn, exerted their influence to get Reichberg's friends and clients favorable treatment from the NYPD.

Beginning in 2013, Reichberg partnered in this enterprise with Jona Rechnitz, who pled guilty and testified at trial as a cooperating witness for the government. Reichberg would contact NYPD officers to request the favors and, if the officer came through, would tell Rechnitz which officer should receive benefits. The officers with whom the pair cultivated these relationships included, among others, Philip Banks III, the Chief of the Department and an unindicted co-conspirator in the scheme; Chief Michael Harrington, Banks's Executive Officer, who pled guilty; and James Grant, who was a lieutenant in Reichberg's precinct before his promotion to the 19th Precinct's Commanding Officer. Grant was Reichberg's co-defendant at trial.

The benefits the officers received took many forms, including trips on private jets and luxury hotel stays with prostitutes; football, basketball, and hockey tickets worth tens of thousands of dollars; international travel arrangements to Israel and the Dominican Republic; home improvements worth thousands of dollars; and approximately $60,000 in business steered toward certain of the officers' private security companies.

Reichberg and Rechnitz's largesse obtained a host of favors from NYPD officers. For example, one of Reichberg's clients was arrested three separate times, but each time was released from custody after Reichberg contacted NYPD officers. Grant exerted his influence to secure the processing and approval of gun licenses, even when those applications were deficient or the applicants unqualified

for the type of license sought. Grant conferred this benefit on Reichberg, who obtained a full-carry gun license without the licensing division bothering to investigate whether he qualified for one. Banks secured Grant's promotion to Inspector in the 19th Precinct, on Manhattan's Upper East Side—a strategic posting valuable to Reichberg and Rechnitz because of its proximity to Rechnitz's Manhattan office. Officers also provided police rides and police escorts to Reichberg and Rechnitz's friends to cut through traffic, arranged for an NYPD police boat to give rides to attendees at a barbecue Reichberg hosted, and arranged for an NYPD helicopter to do a flyover of a cocktail cruise organized by Reichberg.

Ultimately, in April 2018, an indictment[3] filed in the Southern District of New York charged Reichberg with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2; conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349; payment of bribes and gratuities, in violation of 18 U.S.C. §§ 666 and 2; conspiracy to pay bribes and gratuities, in violation of 18 U.S.C. § 371; and obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(1) and 2.[4] The indictment charged Grant with honest services wire fraud, conspiracy to commit honest services wire fraud, conspiracy to pay bribes and gratuities, and receipt of bribes and gratuities, in violation of 18 U.S.C. § 666.

In January 2019, following an eight-week jury trial, Reichberg was convicted of honest services wire fraud, conspiracy to commit

---

[3] The first indictment was filed on July 7, 2016.

[4] Reichberg was also charged with conspiracy to misapply and convert property of a program receiving federal funds, in violation of 18 U.S.C. § 371, but that charge was dismissed before trial.

honest services wire fraud, and conspiracy to pay bribes and gratuities (the bribery counts), as well as obstruction of justice. He was acquitted of the payment of bribes and gratuities. Grant was acquitted of all charges.

The district court sentenced Reichberg to 48 months' imprisonment on each of the four counts of conviction, to run concurrently, and two years' supervised release. This appeal ensued.

## DISCUSSION

On appeal, Reichberg challenges his convictions as follows: (1) evidence collected from his electronic devices should have been suppressed because it was seized in violation of the Fourth Amendment; (2) the district court prejudiced him by correcting a misstatement of law made by co-defendant Grant's attorney; (3) evidence of uncharged conduct should have been excluded as unfairly prejudicial; (4) the government disclosed certain documents in an untimely fashion, prejudicing his defense; (5) the temporary admission of a phone call (GX-300A) against his co-defendant generated spillover prejudice against him; (6) the admission of his non-testifying co-defendant's statements against that co-defendant violated Reichberg's Confrontation Clause rights; (7) the district court abused its discretion in excluding two proposed expert witnesses for the defense; (8) the district court erred by failing to hold a hearing to investigate his attorney's potential conflict of interest; (9) the jury was wrongly instructed on the relevant law; and (10) the evidence was

insufficient to support his convictions.  None of these arguments has merit.[5]

## I.      Motion to suppress

Reichberg argues that the district court erred by denying his motion to suppress evidence from certain email accounts and electronic devices.  He does not contest the initial seizure of those accounts and devices, but rather, he argues that the government's overly broad production of data to his co-defendants from those devices worked an independent unreasonable seizure in violation of the Fourth Amendment.  We assume for the sake of discussion that what Reichberg describes could be an independent Fourth Amendment violation, but we determine that, under the circumstances, suppression was not warranted.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures.[6]   "To safeguard Fourth Amendment rights, the Supreme Court created 'an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial.'"[7]   Suppression (i.e., exclusion) of evidence is required only when suppression would "deter future unlawful . . .

---

[5] Reichberg also argues that the district court's cumulative errors at trial deprived him of a fair trial.  Because we find no error in any of Reichberg's specific objections, we have no occasion to consider the cumulative effect of the alleged errors.  *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013).

[6] U.S. CONST. amend. IV.

[7] *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)).

conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."[8]

The district court, whose factual findings we review only for clear error,[9] denied Reichberg's motion upon finding that the government produced the complained-about data after an "objectively reasonable, if unfortunate, miscommunication between the parties regarding what was being produced and to whom."[10] Specifically, the district court found that the government believed Reichberg was aware that it was producing all data, rather than only responsive data, to his co-defendants. Supporting this belief was the fact that the protective order entered in the case described the government's discovery practices to that effect and the fact that the government had previously made a similarly broad production of Grant's and Reichberg's emails to all defendants.

We easily agree with the district court, upon de novo review of its denial of Reichberg's suppression motion,[11] that suppression was not required in this circumstance. In light of the communications between the parties, it is plain that the government was operating under an objectively reasonable belief that Reichberg had consented to its production practices. And where the government reasonably

---

[8] *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

[9] *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015).

[10] App. at 7683–84.

[11] *Raymonda*, 780 F.3d at 113.

believed the defendant consented to the challenged practice, "suppression would do nothing to deter . . . misconduct."[12]

## II.    Misstatement of law by Grant's counsel

Reichberg argues that he is entitled to a new trial because he was prejudiced by the district court's instruction to the jury that corrected a legal misstatement by Grant's counsel.  We discern no error in the district court's handling of the situation and no prejudice to Reichberg.

Grant's counsel concluded his opening statement to the jury with a misstatement of law, stating: "[I]f you believe Jimmy Grant and Jeremy Reichberg are friends, you must vote not guilty."[13]   The government immediately moved for a curative instruction,  and the district court received briefing and heard argument from counsel on how to address the problem.

The district court then advised the jury that what Grant's counsel had said was not the law.  It elaborated:

> Of course, being friends with someone is not against the law, and giving something of value to a public official solely out of friendship is also not a crime, but contrary to Mr. Meringolo's statement, under the law, it is possible to commit the offenses

---

[12] *United States v. Gomez*, 877 F.3d 76, 94 (2d Cir. 2017) (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)).

[13] App. at 724.

charged here together with people with whom you have a friendship.[14]

Reichberg asserts that this correction by the district court prejudiced him by leading the jury to believe that any consideration of his friendship with Grant was improper. We disagree. The district court had no choice but to correct the plain misstatement of law from Grant's counsel. The district court substituted the correct legal standard in its place, and did so in a balanced and legally accurate fashion.[15]

## III.    Evidence of uncharged conduct

On appeal, Reichberg challenges the admission at trial of three categories of evidence: (1) evidence of him currying favor with Mayor Bill de Blasio in expectation of preferential treatment; (2) evidence about his involvement in a bribe between the President of the Correction Officers' Benevolent Association, Norman Seabrook, and a hedge fund manager, Murray Huberfeld; and (3) evidence that he directed investments to a liquor business run by an individual named Hamlet Peralta in exchange for commissions.

Reichberg objected to the admission of the first two categories before the district court, so we review those evidentiary rulings for

---

[14] *Id.* at 1458.

[15] *See United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (noting that where a defendant argues friendship provided an innocent motivation for his actions, it is proper to instruct the jury that "a valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability" (internal quotation marks omitted)).

abuse of discretion.[16]  We review his unpreserved objection to the Peralta evidence only for plain error.[17]  Regardless of the standards of review, we find no error in the admission of this evidence.

    1.  De Blasio evidence

The evidence of Reichberg's efforts to gain favor with de Blasio was properly admitted as evidence of intent under Federal Rule of Evidence 404(b).  Rule 404(b) makes evidence of uncharged conduct admissible to prove the defendant's intent in committing the charged conduct.[18]  Here, Rechnitz testified that he and Reichberg developed a relationship with de Blasio's chief fundraiser during the 2013 New York City mayoral campaign, and that they did so because "we wanted access, we wanted influence . . . . When we called, we wanted results."[19]  Rechnitz further testified that when he and Reichberg bundled contributions for the campaign, they "would only be donating these funds and getting involved if we were treated that way."[20]  This evidence of similar efforts to obtain "results" from public officials by currying financial favor undercut Reichberg's argument at trial that the benefits he provided NYPD officers were

---

[16] *United States v. Hendricks*, 921 F.3d 320, 326 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 870 (2020).

[17] *United States v. Simels*, 654 F.3d 161, 168 (2d Cir. 2011).

[18] Fed. R. Evid. 404(b)(1).

[19] App. at 3207.

[20] *Id.*

simply gifts, motivated purely by friendship and given with no expectation of receiving anything in return.[21]

We also discern no violation of Federal Rule of Evidence 403 in the admission of this evidence.  Rule 403 requires that, for relevant evidence to be admissible, its probative value must not be substantially outweighed by the danger of unfair prejudice.[22]  There is no such danger here, because the uncharged conduct—legal campaign contribution bundling—was less inflammatory than the charged conduct.[23]  We therefore find no abuse of discretion in the admission of this evidence.

### 2.  Seabrook-Huberfeld evidence

The evidence concerning the bribe between the Benevolent Association President Norman Seabrook and hedge fund manager Murray Huberfeld was properly admitted as evidence of intent for much the same reasons.  At trial, Rechnitz described how he had arranged for Seabrook to invest tens of millions of dollars into Huberfeld's hedge fund in return for a kickback.  Rechnitz and Reichberg then benefitted from this arrangement in two ways: Huberfeld directed charitable donations to organizations of their choice, and their proximity to Seabrook from this arrangement gave

---

[21] *See United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) ("Where intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent.").

[22] Fed. R. Evid. 403.

[23] *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (finding evidence of uncharged conduct not unfairly prejudicial in part because it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").

them an opportunity to get close to Chief Banks (one of Seabrook's friends and an unindicted co-conspirator in the charged scheme). In Rechnitz's words, this arrangement would help them "get in with the cops, get in with the politicians."[24] The evidence of this arrangement therefore tended to prove their intent to "get in with the cops" in the charged scheme, and was no more inflammatory than the facts of the charged scheme. We accordingly find no abuse of discretion in its admission.

### 3. Hamlet Peralta evidence

Turning to the evidence concerning the investments in Hamlet Peralta's liquor business, we also find it properly admitted as relevant to Reichberg's intent in the charged scheme. In this ploy, Reichberg and Rechnitz recruited investors in the liquor business by representing that the business was a good investment, but did not reveal to the investors that in return Peralta was paying kickbacks to Reichberg and Rechnitz. Put differently, just as in the charged scheme, Reichberg was motivated by financial self-interest rather than wanting to provide friends with an unreciprocated benefit. Moreover, we can discern no unfair prejudice from this evidence in large part because, in the end, Reichberg and Rechnitz ended up as victims too. It turned out that Peralta's liquor business was actually a Ponzi scheme, and Rechnitz's own investment in it was lost.

In sum, we find no error in the admission at trial of any of the evidence Reichberg challenges on appeal.

---

[24] App. at 3198.

### IV.    Allegedly late document disclosure

Reichberg argues that the government belatedly disclosed particular documents in violation of Federal Rule of Criminal Procedure 16, and that the violation prejudiced his defense.  We disagree.

The documents at issue here were gun licensing applications found in the work locker of David Villanueva, an NYPD gun licensing officer who pled guilty to bribery and testified as a cooperating witness for the government at trial.   These documents became relevant for impeachment purposes during Villanueva's cross-examination, when Grant's counsel asked Villanueva about whether he had processed applications at the behest of an individual named Ben Petroske.  (Petroske was formerly Villanueva's commanding officer in the gun licensing division, and allegedly took bribes to expedite the processing and approval of select gun license applications.)   Villanueva denied giving special treatment to applications sent to him by Petroske.

During the overnight break in Villanueva's cross-examination, the government produced the gun license applications that had been found in Villanueva's locker to defense counsel.[25]  The next day, during Villanueva's continued cross, Grant's counsel asked Villanueva whether any of the applicants were Petroske's customers.

---

[25] The government had not previously produced these gun licensing applications because none of them concerned Reichberg and it was not planning to use them in its case-in-chief.  *See* Fed. R. Crim. P. 16(a)(1)(E) (requiring the government to produce documents within its possession if "(i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant").

Villanueva denied knowing whose applications had been in his locker or whether any of the applicants were Petroske's customers, and he denied working with Petroske as part of a bribery scheme.

We find no prejudice in the allegedly late disclosure of these applications. Even if we assume that these documents should have been disclosed earlier, the district court ably exercised its discretion to cure any problem.[26] The district court offered the defense the opportunity to recall Villanueva later in the trial, so that the defense would have more time to prepare for cross-examination with the documents in mind. Neither defendant's counsel took the district court up on that offer. We will not now find that the timing of the document disclosure adversely affected Reichberg's trial strategy, much less warrants reversal, when the defense itself saw no need to question Villanueva further.[27]

## V. Temporary admission of GX-300A

Reichberg claims that he suffered spillover prejudice when the district court first admitted the GX-300A telephone call against Grant and later struck GX-300A from the record. Reichberg "bears an extremely heavy burden" in claiming spillover prejudice, needing to

---

[26] *See United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997) (noting that "[w]hen the government has failed to comply with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate," and that we review its determination on that score only for abuse of discretion).

[27] *See id.* (noting that reversal due to a late Rule 16 disclosure "will only be warranted if the nondisclosure results in substantial prejudice to the defendant," including "that the untimely disclosure of the statement adversely affected some aspect of his trial strategy" (internal quotation marks and citations omitted)).

show "prejudice so substantial as to amount to a miscarriage of justice."[28]  He cannot carry that burden here.

GX-300A is a recorded phone call between Grant and Alex Lichtenstein, an individual who separately pled guilty to bribing NYPD gun licensing division officers.[29]  On the recording, Grant and Lichtenstein discuss a program that would permit individuals caught driving with suspended licenses to receive a summons rather than be arrested.  Grant then states that, if the program is enacted, "all the Jews better – better erect a statue for me.  I should not – I shouldn't – I should be able to walk in any Jewish facility and never have to fuckin' pay for anything.  Nah, I'm just jokin'."[30]

After the government moved before trial to admit the call against Grant, along with a host of other evidence about Grant and Lichtenstein's bribery relationship, the district court expressed concern that there could be spillover prejudice with respect to Reichberg.  Specifically, the district court contemplated that the collection of evidence about Grant and Lichtenstein's relationship would be akin to improper propensity evidence against Reichberg, because it could lead the jury to "draw[] the inference that [because] Mr. Grant accepted bribes from one member [Lichtenstein] of the Jewish community in Brooklyn, . . . he must have accepted bribes from

---

[28] *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002) (quoting *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988)).

[29] *See* Judgment, *United States v. Lichtenstein*, 16-cr-342 (SHS) (S.D.N.Y. Mar. 17, 2017), ECF No. 70.

[30] Supp. App. at 37–38.

another member of the community, namely, Mr. Reichberg."[31]  The district court ruled that some but not all evidence of Grant and Lichtenstein's relationship could be admitted.

At trial, the district court admitted the GX-300A recording along with a transcript of the call.  Before the recording was played, the district court gave a limiting instruction to the jury, advising that the call could be "considered with respect to defendant Grant and only defendant Grant."[32]  Later in the trial, however, the district court reversed course and instructed the jury that the call and transcript had been stricken from the record and to "disregard [them] entirely."[33]

Although admitting and then striking evidence is not ideal, we can locate no prejudice to Reichberg from this sequence of events. "[W]e presume that juries follow limiting instructions," but that presumption can be overcome "where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense."[34]  Here, to show spillover prejudice Reichberg would need to rebut two such presumptions arising from the limiting instructions: (1) that the jury initially considered the call only as to Grant, and not as to him; and (2) that the jury later disregarded the call after being instructed to do so.  Reichberg can overcome neither presumption.  Nothing in the record suggests that the jury did not follow the limiting instructions.

---

[31] Tr. of Pre-trial Conference, *United States v. Reichberg,* 16-cr-468 (GHW) (S.D.N.Y. Apr. 23, 2018), ECF No. 216 at 14–15.

[32] App. at 5928.

[33] *Id.* at 6779–80.

[34] *United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007) (internal quotation marks and citation omitted).

Indeed, the jury acquitted Grant—the defendant most directly prejudiced by GX-300A.

## VI.    Confrontation Clause

Reichberg argues that the admission at trial of a series of statements Grant made to the FBI violated his rights under the Sixth Amendment's Confrontation Clause.  We review alleged violations of the Confrontation Clause de novo,[35] and find none here.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[36]   As relevant to Reichberg's argument, "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant."[37]

Reichberg points to five statements made by Grant to an FBI agent, who testified to them at trial, that he claims violated his confrontation right: that (1) Grant was introduced to Reichberg in 2005 through NYPD Commanding Officer Steven McAllister (an unindicted co-conspirator); (2) Grant was friends with Reichberg and socialized with him approximately ten times during the time frame of the charged conspiracy; (3) Grant never accepted anything of value

---

[35] *United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009).

[36] U.S. CONST. amend. VI.

[37] *Richardson v. Marsh*, 481 U.S. 200, 201–02 (1987) (describing the holding of *Bruton v. United States*, 391 U.S. 123 (1968)).

from Reichberg for free; (4) Grant knew taking anything of value from Reichberg for free would get him in trouble with the NYPD; and (5) Grant had purchased a set of diamond earrings from Reichberg, but did not know if Reichberg gave him a discount on the jewelry.

None of the statements offends the Confrontation Clause because none of them "standing alone, would clearly inculpate [Reichberg] without the introduction of further independent evidence."[38] The statements, some of which appear to be exculpatory, would need to be placed in a mosaic of other inculpatory evidence to tend to inculpate Reichberg.

Moreover, the jury was given an immediate limiting instruction that the agent's testimony as to Grant's statements could be considered only against Grant, and not Reichberg. Such limiting instructions generally eliminate any confrontation problem arising from a nontestifying co-defendant's statement "unless the admitted evidence is clearly inculpatory as to the complaining co-defendant and is vitally important to the government's case."[39] As discussed, none of the complained-of statements was clearly inculpatory as to Reichberg, nor was any vitally important in the context of this eight-week trial.

---

[38] *United States v. Delgado*, 971 F.3d 144, 155 (2d Cir. 2020) (internal quotation marks, alteration, and citation omitted).

[39] *United States v. Rubio*, 709 F.2d 146, 155 (2d Cir. 1983) (internal quotation marks and citation omitted).

## VII.   Excluded defense experts

Reichberg argues that the district court erred by excluding the testimony of two of his proposed expert witnesses at trial.  We review this evidentiary ruling for abuse of discretion,[40] and we find none here.

On October 23, 2018, mere weeks before the start of trial, the defendants provided notice of their intent to call two expert witnesses: Robert Thursland, a former NYPD Inspector, and Rabbi Edgar Gluck.  In its disclosure, defense counsel stated that Thursland was planning to testify about NYPD procedures on "providing police escorts, allowing access to parades and other free events, as well as other community policing practices."[41]  Gluck would testify "about the relationship between the NYPD and the Jewish community, including the day-to-day security-related, religious, and cultural concerns that are specific to this particular community."[42]

The district court found the disclosures wanting under Federal Rule of Criminal Procedure 16, which requires that the defense provide the government with its expert's "opinions, the bases and reasons for those opinions, and the witness's qualifications."[43]  The district court gave defense counsel repeated opportunities to supplement its disclosures.  After defense counsel declined to take advantage of those opportunities, the district court precluded these

---

[40] *United States v. Felder*, 993 F.3d 57, 71 (2d Cir. 2021).

[41] Supp. App. at 34.

[42] *Id.* at 35.

[43] Fed. R. Crim. P. 16(b)(1)(C).

experts from testifying. Given the multiple chances the district court afforded the defense to fix its Rule 16 disclosures, and our agreement with the district court that the disclosures were deficient, we will not find an abuse of discretion in the resulting exclusion of these experts.[44]

## VIII.   Attorney's potential conflict of interest

Reichberg asserts for the first time on appeal that the district court should have investigated whether one of his attorneys had a conflict of interest. We review this unpreserved objection for plain error,[45] and we find none.

One of Reichberg's attorneys at trial, Susan Necheles, also "helped" the defense team at the related trial of Murray Huberfeld, the hedge fund manager to whom Reichberg directed investments in exchange for kickbacks. Necheles's involvement in Huberfeld's trial was minimal—she did not enter an appearance on Huberfeld's behalf, and she told the district court in this case that she "never reviewed all of the discovery material [in the Huberfeld case]. I do not know what is in all the discovery material."[46]

It is hardly "clear or obvious" to us, as it must be on plain error review, that the district court should have inquired further into

---

[44] *See Felder*, 993 F.3d at 74 (noting a "district court's broad discretion in fashioning a remedy for Rule 16 failures, which may include . . . ordering the exclusion of evidence" (internal quotation marks and citation omitted)).

[45] *United States v. Cohan*, 798 F.3d 84, 88 (2d Cir. 2015).

[46] Tr. of Pre-trial Conference, *United States v. Reichberg*, No. 16-cr-468 (GHW) (S.D.N.Y. Mar. 12, 2018), ECF No. 140 at 31.

Necheles's involvement in the Huberfeld case.[47] A district court must inquire further "when [it] knows or reasonably should know that a particular conflict exists," but it is "not . . . under a duty to inquire whenever, as a result of creative speculation, one could imagine a situation in which a conflict may have arisen."[48] The district court here would have had to engage in such creative speculation to envision a conflict; Huberfeld and Reichberg's interests were by all accounts aligned, with both contesting their bribery charges to trial. Moreover, Reichberg cannot demonstrate that the district court's failure to inquire further into Necheles's alleged conflict "affected the outcome of the district court proceedings."[49]

## IX.    Jury instructions

Reichberg argues that the jury instructions were erroneous in two ways: (1) the district court failed to instruct the jury that it must find an "agreement" to convict on the honest services charge; and (2) the district court should not have instructed the jury that it could convict under the "as opportunities arise" theory of bribery, which Reichberg argues is no longer valid in the wake of *McDonnell v. United States*.[50]

---

[47] *See Cohan*, 798 F.3d at 88 (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).

[48] *United States v. Velez*, 354 F.3d 190, 197–98 (2d Cir. 2004) (internal quotation marks and citation omitted).

[49] *Cohan*, 798 F.3d at 88 (quoting *Marcus*, 560 U.S. at 262).

[50] 136 S. Ct. 2355 (2016).

We review jury instructions de novo, finding error if the charge "either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard."[51]  We find no error here.

1. Agreement

The district court instructed the jury that the government did "not have to prove that there was an express or explicit agreement that the public official would perform official acts in exchange for the bribe," but rather had "to prove there was at least an implicit agreement that [the official] would perform official acts in exchange for the bribe."[52]  The district court further explained that the government did "not have to prove an express or explicit agreement at the time of payment that any particular official action would be taken."[53]  Instead, "[i]t is sufficient if the defendant . . . understood that the public official was expected, as a result of the payment to . . . exercise particular kinds of influence as specific opportunities arose."[54]

Reichberg asserts that these instructions erroneously failed to require sufficient proof of an agreement, but we disagree.  The instructions here actually required the government to prove more than is necessary under our precedent, charging the jury that it must find the presence of "at least an implicit agreement that [the official] *would* perform official acts in exchange for the bribe" (emphasis

---

[51] *United States v. Silver*, 948 F.3d 538, 547 (2d Cir. 2020) (internal quotation marks and citation omitted), *cert. denied*, 141 S. Ct. 656 (2021).

[52] App. at 7213.

[53] *Id.* at 7214.

[54] *Id.*

added). In fact, so long as the parties to the bribe share "an understanding that the payments were made in return for official action, . . . it is not necessary that the public official in fact intend to perform the contemplated official act."[55]

### 2. "As opportunities arise"

When the government proceeds under the "as opportunities arise" theory of bribery, it must prove "that a public official received a payment to which he was not entitled" and that, "at the time of the payment," the payor and payee "understood that [the payee] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise."[56] Reichberg argues that this theory of bribery is no longer valid after *McDonnell*, but he is incorrect.

We made clear, after Reichberg took this appeal, that the "as opportunities arise" theory of bribery remains good law following *McDonnell*. As relevant here, *McDonnell* held that the official act expected to be taken by a bribed public official must be "a decision or action on a question, matter, cause, suit, proceeding or controversy" that "involve[s] a formal exercise of governmental power" and must concern "something specific and focused that is pending or may by law be brought before a public official."[57] Although this "raised the question of whether the action to be taken in the future by a public

---

[55] *Silver*, 948 F.3d at 551 (internal quotation marks, alterations, and citations omitted).

[56] *Skelos*, 988 F.3d at 655 (internal quotation marks, alterations, and citation omitted).

[57] *McDonnell*, 136 S. Ct. at 2371–72 (internal quotation marks omitted).

official under the 'as opportunities arise' theory of bribery is compatible with the heightened specificity of 'official act' required by *McDonnell*,"[58] we have since answered that question in the affirmative.[59]

Additionally, the particular instructions given in this case on the "as opportunities arise" theory were appropriate. The district court charged the jury:

> The government . . . need not prove an explicit promise to perform a particular act was made at the time of the payment. In other words, the government does not need to show a direct link between a benefit received and a specifically identified official act. Rather, it is sufficient if [the official] understood he was expected as a result of the payment to exercise particular kinds of acts or influence on behalf of the payor on an "as needed" basis or as specific opportunities arose.[60]

By requiring the jury to find that the official "understood he was expected as a result of the payment to exercise particular kinds of acts or influence," this instruction successfully required the jury to find that the official action was to be taken on a "specific and focused question or matter."[61] We previously stated that "instructions

---

[58] *Skelos*, 988 F.3d at 655–56.

[59] *Silver*, 948 F.3d at 552.

[60] App. at 7214.

[61] *Silver*, 948 F.3d at 568 (emphasis omitted).

requiring the jury to find that the official understood that he or she was expected to exercise *particular kinds of influence* would not be in error after *McDonnell*" because "[t]he phrase 'particular kinds of influence' connotes that the official action must relate to a sufficiently particular, focused, or concrete question or matter."[62]  Even though the wording of the instructions here differs from what we recommended in *Silver*,[63] it does not "le[ave] open the possibility that the jury could convict even if [the official] was expected to take official action on *any* question or matter in return for the payment."[64] Accordingly, although these jury instructions were given without the benefit of *Silver*'s guidance, they were not erroneous.

## X.    Sufficiency of the evidence

Finally, Reichberg challenges the sufficiency of the evidence on all counts of conviction.  We review the sufficiency of evidence de novo, but in doing so "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's

---

[62] *Id.* at 568 n.19 (emphasis in original).

[63] *Id.* at 568 ("The jury should have been instructed that, to convict on honest services fraud, the Government must prove that, at the time the bribe was accepted, [the official] promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose." (emphasis in original)).

[64] *Skelos*, 988 F.3d at 656 (emphasis in original) (finding erroneous "instructions requir[ing] only that [the official] be expected to 'perform official acts in exchange for the property'"); *see also Silver*, 948 F.3d at 568–69 (faulting instructions requiring the jury to find that the official "was 'expected to exercise official influence or take official action for the benefit of the payor'" for permitting the quid pro quo to be "too open-ended" (emphasis omitted)).

assessment of witness credibility and its assessment of the weight of the evidence."[65]  Reichberg "bears a heavy burden" to overcome this "exceedingly deferential" standard of review.[66]  "[W]e will uphold the judgments of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[67]  Reichberg cannot bear his burden, for the reasons that follow.

### 1. Bribery counts

Reichberg argues there was insufficient evidence to support his conviction on the bribery counts[68] because the evidence does not establish that the bribed officers took "official action," and, even if they did take official action, the evidence does not support the required link between that official action and the bribe payment that prompted it.  We disagree.

The official acts the government relied upon are all proper "official acts" under the standard set forth in *McDonnell*,[69] upon

---

[65] *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal quotation marks omitted).

[66] *Id.* (internal quotation marks omitted).

[67] *Id.* (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[68] Honest services wire fraud, 18 U.S.C. §§ 1343, 1346 and 2; conspiracy to commit honest services wire fraud, 18 U.S.C. §§ 1343, 1346, 1349; and conspiracy to pay bribes and gratuities, 18 U.S.C. § 371.

[69] *McDonnell*, 136 S. Ct. at 2371–72 ("[A]n official act is a decision or action on a question, matter, cause, suit, proceeding or controversy" that "involve[s] a formal exercise of governmental power" and concerns "something specific and

which the jury was adequately instructed.  The government alleged the following official acts: (1) approving a gun license application; (2) promoting or transferring a police officer; (3) making an arrest, and then making a decision about whether to issue a desk appearance ticket to the arrestee; (4) authorizing the use of a police helicopter for a particular occasion; (5) authorizing the use of a police boat for a particular occasion; and (6) deploying a police escort for a private citizen or transporting a private citizen in a police car.  All of these are the sort of specific, formal exercises of government power that can constitute official acts.[70]

The evidence was also sufficient to support the jury's conclusion that the benefits Reichberg provided were linked to the bribed officials' exercise of particular kinds of influence in return.  At trial, Rechnitz testified that the pair provided benefits to officers expecting to get police action in return, in the form of "results," not merely "access."[71]  The combination of that testimony with the timing of the circumstantial evidence provided a reasonable basis for the jury to infer that particular benefits were linked to particular official actions.  For example, after Reichberg paid for Grant's home improvements in June 2014, Grant pressured other officers to approve Reichberg's gun license application in subsequent months.  Banks

---

focused that is pending or may by law be brought before a public official." (internal quotation marks omitted)).

[70] *See, e.g., id.* at 2370 (allocation of government resources); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (licenses and permits); *United States v. Fattah*, 914 F.3d 112, 156 (3d Cir. 2019) (hiring government employee); *United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019) (decision about whether to bring charges), *cert. denied*, 140 S. Ct. 895 (2020).

[71] App. at 3360.

secured Grant's promotion to a position that would benefit Reichberg shortly after Reichberg had paid for Banks to travel to Israel. And at a time when Reichberg and Rechnitz were steering about $60,000 in business to Harrington's security company, Harrington arranged for the men to benefit from police helicopters, boats, and vehicles. Moreover, Grant complained explicitly to Reichberg that he felt he had not received a good enough perk in exchange for processing a particular gun license application—a complaint that was captured on a recorded phone call admitted into evidence at trial.

Reichberg's efforts on behalf of one individual in particular leave us with no doubt that this jury's verdict was reasonable and supported by the evidence. Eddie Sankari was arrested three times by the NYPD, and each time, Reichberg managed to secure his release from custody on the same day. The first arrest-and-release was on February 16, 2014. Reichberg texted Grant "Eddie Sankari" and "78pct," and one minute later Grant turned around and called the 78th Precinct, where Sankari was being held, setting in motion Sankari's release.[72] Grant took this action shortly after Reichberg and Rechnitz had shown up at Grant's house dressed as elves on Christmas with a pile of gifts for Grant and his family.

Sankari's second arrest-and-release was on October 28, 2015. Reichberg got in touch with McAllister, another high-ranking NYPD contact, who asked Reichberg who he was "looking to get out."[73] Reichberg told McAllister it was Sankari, "the floor guy from Brooklyn," to which McAllister responded, "What kind of floors?"

---

[72] Supp. App. at 61.

[73] *Id.* at 65.

and "Did we make any headway on the [wrist]watch?"[74] Reichberg told McAllister that Sankari provided carpeting services and, about the watch, that Reichberg's "guy is trying to locate one for a good price, he asked if we can wait until the watch show."[75] In response, McAllister said that Sankari would be released that night.

Sankari's third arrest-and-release was on December 16, 2015. McAllister indicated hesitancy about releasing him this time around, asking, "Who is this guy we are trying to get out? He was arrested for same thing not to [sic] long ago, maybe he needs night in jail."[76] But when Reichberg reminded McAllister that Sankari was the "carpet guy,"[77] McAllister's misgivings evaporated. McAllister told Reichberg that Sankari "owes you big"[78] and added, by text message, "Need new carpet for Summer house. Lol."[79] Later that night, as Sankari was being released, McAllister provided Reichberg with the number of bedrooms and square footage he wanted to have carpeted.

In view of this collection of evidence, we have no difficulty finding the jury's verdict to be supported by sufficient evidence and affirming the bribery count convictions.

   2. Obstruction of justice

---

[74] *Id.*

[75] *Id.*

[76] *Id.* at 68.

[77] *Id.*

[78] *Id.* at 69.

[79] *Id.*

Reichberg also argues that the evidence was insufficient to support his conviction for obstruction of justice, but we again disagree. The evidence at trial demonstrated that when Reichberg became aware he was under investigation, he invited his brother to his house and turned over multiple cell phones and business cards to his brother. On appeal, Reichberg's principal contention is that the evidence did not support his intent to obstruct justice because there were other electronic devices remaining at his house for the FBI to find that he did not give to his brother. We think the jury was nonetheless entitled to conclude that Reichberg intended to conceal the devices he did give to his brother.[80] That Reichberg's efforts to obstruct justice were incomplete does not invalidate the conviction based on the completed acts.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of conviction.

---

[80] *See* 18 U.S.C. § 1512(c)(1) (making it a crime to corruptly "conceal[] a record, document, or other object, or attempt[] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding").