24-2509(L)
*United States v. Goldstein*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of March, two thousand twenty-six.

Present:

> ROBERT D. SACK,
> WILLIAM J. NARDINI,
> EUNICE C. LEE,
>    *Circuit Judges*.

_____

UNITED STATES OF AMERICA,

>    *Appellee*,

> v.

ERIC GOLDSTEIN, BLAINE ILER,
MICHAEL TURLEY, BRIAN TWOMEY,

>    *Defendants-Appellants*.

_____

24-2509 (Lead);
24-2513 (Con);
24-2514 (Con);
24-2523 (Con)

| | |
|---|---|
| For Defendant-Appellant Goldstein: | SARAH BAUMGARTEL (Ashok Chandran *on the brief*), Federal Defenders of New York, Inc., New York, NY |
| For Defendant-Appellant Iler: | James G. McGovern, Samuel Rackear, and Tiffany Monroy, Vinson & Elkins LLP, New York, NY |

1

For Defendant-Appellant Turley: AITAN D. GOELMAN (Daniel A. Braun and Leila Bijan *on the brief*), Zuckerman Spaeder LLP, Washington, DC

For Defendant-Appellant Twomey: AMY MASON SAHARIA (Brendan V. Sullivan, Jr., Tobin J. Romero, and Patrick J. Looby *on the brief*), Williams & Connolly LLP, Washington, DC

For Appellee: LAURA ZUCKERWISE (Amy Busa, Andrew D. Grubin, and Kaitlin McTague *on the brief*), Assistant United States Attorneys, *for* Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, Brooklyn, NY

Appeal from judgments of the United States District Court for the Eastern District of New York (Denny Chin, *Circuit Judge, sitting by designation*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED**.

Defendants-Appellants Eric Goldstein, Blaine Iler, Michael Turley, and Brian Twomey appeal from criminal judgments, following a jury trial in the United States District Court for the Eastern District of New York, entered on September 19 and 20, 2024. This case arises from a bribery scheme between Goldstein, then an official of the New York City Department of Education ("DOE"), and Iler, Turley, and Twomey, three executives at a food services company named SOMMA. Goldstein was the Chief Executive Officer of the DOE's Office of School Support Services ("OSSS"), which provided in-school meals to students throughout New York City through the DOE's Office of Food and Nutrition Services ("SchoolFood"). The Government introduced evidence at trial that the three executives (the "SOMMA Defendants") induced Goldstein to ensure that SchoolFood sourced products (including yogurt parfait and chicken) from SOMMA, as well as to expedite and increase the volume of SchoolFood's purchases from SOMMA. In return, the SOMMA Defendants gave things of value to Goldstein by contributing

2

cash to a separate beef-importing company, Range Meats Supply Co. ("RMSCO"), that they co-owned with Goldstein and another partner, and by increasing Goldstein's ownership share of that company.

After a four-week trial in May and June 2024, a jury returned guilty verdicts on seven counts: (1) conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (all Defendants); (2) Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Goldstein); (3) conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371 (all Defendants); (4) federal program bribery, in violation of 18 U.S.C. § 666(a)(2) (the SOMMA Defendants); (5) federal program bribery, in violation of 18 U.S.C. § 666(a)(1)(B) (Goldstein); (6) conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349 (all Defendants); and (7) honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (all Defendants). The district court sentenced the Defendants to terms of imprisonment of varying lengths: 24 months for Goldstein; 12 months for Iler; 15 months for Turley; and 15 months for Twomey.

All four Defendants now challenge their convictions. Goldstein also challenges his sentence, arguing that it was procedurally unreasonable. We assume the parties' familiarity with the case.

## I.    Sufficiency of the Evidence

We begin with the Defendants' challenge to the sufficiency of the evidence supporting their convictions, on which they bear a "heavy burden." *United States v. Osuba*, 67 F.4th 56, 61 (2d Cir. 2023).[1]  All Defendants argue that for each of the substantive offenses, the Government

---

[1] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

was required to establish a *quid pro quo* that satisfies the criteria set forth in *McDonnell v. United States*, 579 U.S. 550 (2016), and that it failed to do so. They also contend that the Government failed to prove a conspiracy to commit these substantive offenses that occurred within the applicable five-year limitations period. We disagree.

The Defendants were charged with three substantive offenses—Hobbs Act extortion, federal program bribery, and honest services wire fraud—that accused them of bribe-taking (on the part of Goldstein) and bribe-giving (on the part of the SOMMA Defendants). *See Evans v. United States*, 504 U.S. 255, 267–68 (1992) (holding that Hobbs Act extortion includes bribery); *Snyder v. United States*, 603 U.S. 1, 10 (2024) (holding that § 666 prohibits bribery); *United States v. Skilling*, 561 U.S. 358, 408–09 (2010) (holding that honest services fraud encompasses bribery).[2] At trial, the parties agreed that to prove bribery under each of these statutes, the Government must make out a *quid pro quo*: an exchange of a thing of value for official action. *See McDonnell*, 579 U.S. at 574; *United States v. Silver*, 948 F.3d 538, 548–49 (2d Cir. 2020) (Hobbs Act extortion); *Snyder*, 603 U.S. at 10–11.[3] In *McDonnell*, the Supreme Court established

---

[2] We reject Goldstein's challenge to the constitutionality of the honest services statute (18 U.S.C. § 1346) and the applicability of Hobbs Act extortion to bribery schemes. As Goldstein acknowledges, these arguments are foreclosed by binding Supreme Court precedent. *See Skilling*, 561 U.S. at 408–09 (honest services fraud); *Evans*, 504 U.S. at 265–66 (Hobbs Act extortion).

[3] *McDonnell* interpreted the definition of "official acts" under the federal bribery statute, 18 U.S.C. § 201(a)(3). 579 U.S. at 567. This Court has acknowledged that § 201's definition of "official acts" can be incorporated into the elements of honest services fraud and Hobbs Act extortion, *United States v. Silver*, 864 F.3d 102, 116 n.67 (2d Cir. 2017), but we have not resolved the question of whether federal program bribery under § 666 extends further. In *United States v. Ng Lap Sen*, 934 F.3d 110 (2d Cir. 2019), this Court observed that "the *McDonnell* official act standard, derived from the *quo* component of bribery as defined by § 201(a)(3), does not necessarily delimit the *quo* components of . . . § 666." *Id.* at 132–33. Five years later, in *Snyder*, the Supreme Court narrowed § 666 to cover only "accepting bribes that are promised or given before [an] official act," and not "gratuities." 603 U.S. at 5. This Court has not had occasion to reassess its observation in *Ng Lap Sen* about the potential scope of § 666. Nor must the Court do so here. Both parties requested, and the district court adopted, *McDonnell's* narrow articulation of a *quid pro quo* when charging the jury on the elements of federal program bribery. Accordingly, even if § 666 prohibits more "*quo*" than an "official act" as defined in § 201(a)(3), the narrow charge given here to the jury was favorable to the defendant, and therefore any hypothetical error would be harmless. *Ng Lap Sen*, 934 F.3d at 142.

a two-part test for determining whether a defendant's conduct constitutes an official act: "First, the Government must identify a question [or] matter . . . that may at any time be pending or may by law be brought before a public official. Second, the Government must prove that the public official made a decision or took an action on that question [or] matter . . . or agreed to do so." 579 U.S. at 567. "[A]t the time the bribe is made, the promised official act must relate to a properly defined question [or] matter . . . ." *Silver*, 948 F.3d at 556. This question or matter must be sufficiently "focused," "concrete," and "specific," *id.* at 556–57—*i.e.*, something that "can be put on an agenda, tracked for progress, and then checked off as complete," *McDonnell*, 579 U.S. at 570. However, the specific means that the bribed official will use to act upon the question or matter need not be determined at the time of the *quid pro quo*. *Silver*, 948 F.3d at 553.

At trial, the Government provided evidence regarding various alleged exchanges between the Defendants of benefits for official action. We focus our discussion on a particular exchange that occurred in November 2016 between the SOMMA Defendants and Goldstein. For reasons explained below, we conclude that the jury could have permissibly concluded beyond a reasonable doubt, based on the trial evidence, that this episode constituted a *quid pro quo* that supports all of the counts of conviction. Accordingly, we need not determine whether any of the other exchanges similarly qualified as a *quid pro quo*.

The contours of this exchange are as follows: In 2016, rigid objects were discovered in some of the chicken that SOMMA had sold to DOE's school meals program. As a result, SchoolFood placed a hold on buying any further chicken from SOMMA. The hold was lifted some time thereafter, but again objects were found in the chicken. On October 31, 2016, SchoolFood placed a second hold. This hold placed enormous financial pressure on the SOMMA Defendants. Goldstein, in the exercise of his authority as the head of OSSS, agreed to lift the second hold on

November 30, 2016, thereby opening the way for SchoolFood to resume its purchases of chicken from SOMMA. But Goldstein did not lift the hold until after the SOMMA Defendants delivered something of value to him. Over a period of time in the fall of 2016, the SOMMA Defendants had discussed exiting their joint investment with Goldstein in RMSCO, the beef-importing business. No agreement had yet been executed at the time SchoolFood placed the second hold. While that hold was in place, Goldstein repeatedly contacted the SOMMA Defendants in an effort to get the RMSCO deal completed. On November 29, 2016, the parties executed a contract that provided concrete financial benefits to Goldstein. Most notably, the SOMMA Defendants ceded their interests in RMSCO back to RMSCO itself, which left Goldstein and his remaining partner with a greater proportionate ownership interest in the company. The SOMMA Defendants also provided RMSCO with $66,670 in cash, among other benefits. As noted above, Goldstein agreed to lift the second hold the very next day.

The jury was entitled to conclude that this was a *quid pro quo*. The *quid* in this exchange was something of value that the SOMMA Defendants gave to Goldstein: a deal whereby SOMMA contributed money to RMSCO, and left Goldstein with a larger share of that company. The *quo* that Goldstein provided in return was his direction as head of OSSS to lift the hold on SchoolFood's purchase of SOMMA's chicken products. Goldstein's lifting of the hold clearly constituted an "official act" as described in *McDonnell*: It was a concrete and specific act that could be "put on an agenda, tracked for progress, and then checked off as complete." *McDonnell*, 579 U.S. at 570.

Moreover, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that the *quid* had been provided in exchange for the *quo*. The Defendants argue that nothing links the two except for parallel timing: Goldstein lifted the hold one day after the SOMMA Defendants

6

inked the RMSCO contract. In the Defendants' recounting of the evidence, the record would not allow a rational jury to conclude that this was anything more than mere coincidence. But in the right context, parallel timing can provide strong circumstantial evidence of a connection between two events. And so it is here. In the light of all the evidence in the trial record, the jury was entitled to infer that Goldstein's decision to lift the hold on November 30 was motivated by the SOMMA Defendants' execution of the contract the previous day. There was evidence that Goldstein dragged his feet on lifting the hold until the RMSCO contract was executed: One of Goldstein's employees testified that the DOE urgently needed to determine whether to lift the hold, and that Goldstein delayed making a decision during the final weeks of November. Likewise, the jury could reasonably conclude that the SOMMA Defendants were hustling to get the contract done to prod Goldstein to lift the hold. During this period of delay, email communications showed that Goldstein was pressuring the SOMMA Defendants to finalize the RMSCO deal. Based on this and other evidence, the jury could have reasonably concluded that Goldstein delayed his decision to lift the hold, and the SOMMA Defendants hurried to complete the RMSCO contract, precisely because they knew and intended that each event was dependent on the other.

The Defendants argue that by October 2016, before the second hold arose, they had already negotiated what would ultimately become the material terms of the RMSCO contract. They argue that because they had already agreed to those terms, the contract and its benefits to Goldstein could not have been provided in exchange for Goldstein's subsequent lifting of the hold. But that argument ignores the fact that the RMSCO contract was not actually executed until November 29, that Goldstein had no guarantee that the SOMMA Defendants would in fact deliver on those terms, and that Goldstein repeatedly pressured the SOMMA Defendants in the waning days of November 2016 to get the contract done. A bribe transaction remains ongoing, even after the parties

7

tentatively settle on terms, until both *quid* and *quo* are delivered. And that is precisely what happened here.

The conclusion that the November 2016 events constituted a corrupt *quid pro quo* rather than a fluke of timing is further supported by evidence going back as far as the spring of 2015 showing that Goldstein and the SOMMA Defendants shared a close, inappropriate, and transactional relationship. In July 2015, for example, Iler reported to Turley and Twomey that, during a business trip together, Goldstein told him: "I'm going to buy a lot of fucking chicken from you guys, let's do the beef." Joint App'x at 2282. This suggested a link, in the minds of both Goldstein and the SOMMA Defendants, between Goldstein's authorization of product purchases from SOMMA on the one hand, and the SOMMA Defendants' support of Goldstein's financial interests in RMSCO on the other. The Government also introduced a variety of statements by the SOMMA Defendants indicating that Goldstein had previously exercised his authority over SchoolFood for SOMMA's benefit. *See id.* at 2269 ("Eric delivered FIRST THING this morning."), 2305 ("Tell [Goldstein] we may need a 'nudge.' Don't want to wait until Jan[uary] to launch."), 3057 ("Talked to [Goldstein]. He's going to bust balls tomorrow."), 2338 ("Whoever talks to [Goldstein] first, this needs to [be] addressed."). The evidence also showed that Goldstein failed to disclose his relationship with SOMMA and RMSCO to the DOE when reporting conflicts of interest. His failure to do so contrasted strongly with his previous adherence to conflict-reporting obligations; a rational jury could have concluded, in the context of all the evidence at trial, that Goldstein wanted to conceal his relationship with the SOMMA Defendants precisely because it was infected by bribery.

We now turn to the conspiracy charges. The Defendants contend that there is insufficient evidence that any conspiracy to commit the charged substantive offenses occurred within the five-

8

year limitations period. *See* 18 U.S.C. § 3282. But this argument is premised entirely on their contention that the November 2016 exchange did not constitute a prohibited *quid pro quo*. As explained above, we reject this argument. The Defendants have conceded that if their sufficiency argument fails with respect to substantive offenses based on the November 2016 events, it also fails with respect to the conspiracy counts. We agree. The indictment was returned on October 28, 2021. Accordingly, the five-year limitations period for the conspiracy counts extends back to October 28, 2016. The November 2016 exchange, which involved an agreement among all Defendants, falls comfortably within this period. We therefore reject the Defendants' challenge to the sufficiency of the evidence on the conspiracy counts.

## II.     Evidentiary Challenges

We next turn to the Defendants' challenges to two of the district court's evidentiary rulings. "Judges are entrusted with considerable discretion when deciding which evidence to admit or exclude at trial. We will reverse for an abuse of discretion only when an evidentiary ruling is manifestly erroneous or arbitrary and irrational." *United States v. Dawkins*, 999 F.3d 767, 788 (2d Cir. 2021).

All four Defendants argue that certain evidence admitted at trial about bones or otherwise foreign matter in SOMMA's chicken tenders should have been excluded as unduly prejudicial under Federal Rule of Evidence 403. In the district court, they timely objected to the admission of testimony from a SchoolFood employee about the risks to schoolchildren from such objects, evidence of a SchoolFood employee receiving the Heimlich maneuver after choking on an object in a SOMMA chicken tender, photographs of the foreign matter, and evidence of metal contamination in SOMMA food in 2017. The district court overruled these objections, reasoning that the "probative value" of the contested evidence was "high," Joint App'x at 3134, and that it

9

bore on the "seriousness of the incident" caused by the discovery of foreign matter in SOMMA's chicken products, *id.* at 4128; it also held that the photos were not "salacious" and that the evidence on this point had not been "inflammatory," *id.*

We discern no abuse of discretion in these conclusions. As the Defendants admit, the fact that SOMMA's chicken tenders were put on hold due to the discovery of foreign matter was both relevant and admissible. The events surrounding the implementation of this hold, including the risks posed by SOMMA's products, spoke directly to the urgency of the SOMMA Defendants' desire to lift the hold and the timing of Goldstein's decision to do so. The district court did not abuse its discretion when it concluded that the probative value of this evidence was not substantially outweighed by a danger of unfair prejudice.

We similarly reject Goldstein's argument that the district court abused its discretion in admitting evidence about his failure to disclose his relationships with SOMMA and RMSCO to the DOE as part of his conflict-reporting obligations. Goldstein claims that this evidence created a significant risk of juror confusion and undue prejudice because it invited the jury to convict him based on his violation of ethics rules, not the charged criminal conduct. However, this evidence was relevant and bore on a proper purpose under Federal Rule of Evidence 404(b): Goldstein's intent to participate in the charged bribery scheme. Goldstein's failure to disclose his relationships with SOMMA and RMSCO in the face of his obligation to do so contributed to an inference that he knew something was improper about the relationship and therefore wanted to hide it. Goldstein's prior disclosure of far more minor conflicts of interest—including requests for travel, to accept expenses for professional conferences, to attend fundraisers, to serve on non-profit boards, and to accept small gifts—strengthened this inference. Further, while the extent of conflict-of-interest evidence might have created some risk of confusing the jury about the legal

10

requirements of the charged offense, any potential prejudice was minimized by the district court's instructions to the jury that Goldstein could not be held criminally liable for violating conflict-of-interest rules, and that this evidence could be considered only to "evaluat[e] Mr. Goldstein's state of mind with respect to the charged offense." Joint App'x at 6192. This instruction was legally correct, *see, e.g., Dawkins*, 999 F.3d at 787 (holding that evidence that defendants broke NCAA rules "was [] probative of the defendants' corrupt intent" to violate § 666), and "we presume that juries follow limiting instructions," *United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021).

### III.     Turley's Cross-Examination of Agent Duome

We next turn to Turley's challenge to the district court's curtailment of certain questions during his cross-examination of FBI Special Agent Joseph Duome about his purported bias. At trial, the Government presented testimony from Agent Duome about an interview of Turley conducted at his home in Arkansas during the investigation, during which Turley allegedly made false statements to conceal the conspiracy. Turley's counsel thoroughly cross-examined Agent Duome about that interview, including the reliability of his recollection. At a certain point, defense counsel asked the agent if he also participated in the subsequent arrest of Turley. The Government objected that this went beyond the scope of the direct testimony, and the district court sustained the objection. Defense counsel explained that he wanted to ask the agent about "conversations that he had at the house after Mr. Turley's arrest," but the district court adhered to its ruling.

Later, defense counsel explained to the court that he had wanted to elicit from Agent Duome that, during the arrest, the agent removed his mask and asked Turley, "Remember me?" The district court then realized that it had initially confused the Government's objection with a different one that had been raised pretrial with respect to uncounseled statements made by a different defendant. Accordingly, the court gave Turley's counsel an opportunity to explain why

11

it would be appropriate to recall Agent Duome to the stand. Upon hearing the defense describe the testimony that it thought the agent could provide, the court adhered to its earlier ruling. The district court concluded that even if Agent Duome had said what counsel alleged, "I don't know what it shows." *Id.* at 4132–33. Turley now contends that this ruling violated his rights under the Confrontation Clause of the Sixth Amendment because it deprived him of the ability to probe Agent Duome for bias. We discern no abuse of discretion in the district court's ruling.

A criminal defendant's rights under the Confrontation Clause are violated when the defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Turley was not denied such an opportunity. Even assuming that Agent Duome acted as Turley suggests and that the agent's conduct was arguably rude, the probative value of such evidence was minimal. Turley also contends that he should have been able to cross-examine the agent on other issues relating to the circumstances of the arrest, such as why the agent traveled from New York to participate in Turley's arrest in Arkansas, and what Turley characterizes as heavy-handed tactics (including the number of agents, the fact they were armed, and the time of day they executed the arrest warrant). We conclude that answers to such questions would have shed little, if any, light on Agent Duome's potential bias, and that Turley's rights under the Sixth Amendment were not violated by the district court's preclusion of questioning on such minor matters.

## IV.    Goldstein's Loss Amount

Finally, we discern no merit in Goldstein's contention that the district court erred in concluding that the loss stemming from the charged conduct exceeded $95,000, and in therefore imposing an eight-level enhancement under Section 2C1.1(b)(2) of the United States Sentencing

Guidelines. Section 2C1.1(b)(2) of the Guidelines provides four methods for calculating loss for a bribery offense: (1) the value of the payment; (2) the benefit received or to be received in return for the payment; (3) the value of anything obtained or to be obtained by a public official; and (4) the loss to the government from the offense. Here, the district court adopted the first method and calculated loss as the value of SOMMA's payments to RMSCO. Goldstein argues that Application Note 3 to Section 2C1.1 required the district court to subtract funds that RMSCO used for legitimate business expenses from the loss amount. But that Application Note applies only to the "benefit received" method of calculating loss, not the "value of the payment" method that the court adopted. *See* U.S.S.G. § 2C1.1 n..3. Nothing in Section 2C.1.1(b)(2) suggests that legitimate business expenses must be subtracted from the "value of the payment" measure of loss. The district court therefore committed no error with respect to sentencing.

\* \* \*

We have considered the Defendants' remaining arguments and find them unpersuasive. For the foregoing reasons, the judgments of the district court are **AFFIRMED**.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

13